**NATIONAL LABOR RELATIONS BOARD
v. H. E. FLETCHER CO.
No. 3403.**

Circuit Court of Appeals, First Circuit.

Dec. 18, 1939.

**460**

Malcolm F. Halliday, Asst. Gen. Counsel, N. L. R. B., of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Samuel Edes and Mary Lemon Schleifer, Attys. N. L. R. B., all of Washington, D. C., on the brief), for the Board.

Richard B. Walsh, of Lowell, Mass. (Harvey, Harvey & Walsh, of Lowell, Mass., on the brief), for Fletcher Co.

Before WILSON and MAGRUDER, Circuit Judges, and FORD, District Judge.

FORD, District Judge.

The National Labor Relations Board, hereinafter called the Board, petitions this court under the provisions of Section 10 (e) of the National Labor Relations Act, 29 U.S.C.A. § 160(e), hereinafter referred to as the Act, for the enforcement of an order made by it under the provisions of Section 10(c) of the Act in a proceeding instituted against the respondent. A charge was filed with the Board by the Granite Cutters' International Association of America, hereinafter called the Union, on September 3, 1937, later amended on September 24, 1937, in which it was alleged the respondent had engaged in and was engaged in unfair labor practices within the meaning of Section 8, subsections (1) and (2) of the Act, 29 U.S.C.A. § 158(1, 2), in that it had dominated and interfered with the formation and administration of, and contributed financial and other support to, a labor organization known as the "Employees' Representation Plan for H. E. Fletcher Co.," hereinafter called the Plan.

On September 24, 1937, a complaint was issued by the Regional Director of the Board alleging that the respondent had engaged in and was engaged in certain unfair labor practices affecting commerce, within the meaning of the Act. Copies of the complaint and notice of hearing were given to the respondent, the Union, and the Plan.

On October 1, 1937, the "Employees of H. E. Fletcher Co.," a voluntary association functioning under the Plan, filed a motion to intervene, which was granted.

The complaint alleged that the respondent had its principal place of business in West Chelmsford, Massachusetts, and in the course and conduct of its business causes and has continuously caused the granite which it quarries to be transported in interstate commerce from Massachusetts into, and through, other states of the United States. Further, that:

"3. The respondent, by its officers and agents has dominated and interfered with and is dominating and interfering with the formation and administration of a labor organization, to wit, the Employees Representation Plan of the H. E. Fletcher Co., in that (a) the respondent sponsored and caused the formation of said Plan, (b) the respondent, through its officers and agents has actively participated in said Plan and given aid and encouragement thereto and (c) the respondent has contributed financial and other support to said Plan."

"5. By the aforesaid acts, respondent has heretofore interfered with, restrained and coerced and is now interfering with, restraining and coercing its employees in the exercise of their rights to self-organization, to form, join, and assist labor organizations to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining and other mutual aid and protection * *. * "

"7. The aforesaid acts of respondent constitute unfair labor practices affecting commerce, within the meaning of Section 8, subdivisions (1), and (2), and Section 2, subdivisions (6) and (7) of said Act."

The respondent in its answer, filed October 4, 1937, denied all the material allegations in the complaint and on October 15, 1937, filed a motion to dismiss the complaint for lack of jurisdiction.

Hearings were held on October 18 and 19, 1937, before a trial examiner for the Board and on December 18, 1937, the latter filed his report containing his findings

of fact and recommendations and on March 2, 1938, the Board issued its decision setting forth its findings of facts, conclusions of law, and its order, which reads as follows:

"that the respondent, * * * its officers, agents, successors, and assigns shall:

"1. Cease and desist

"(a) From in any manner dominating and interfering with the administration of Employees' Representation Plan for H. E. Fletcher Co., and its adjunct, Employees of H. E. Fletcher Co., or any other labor organization of its employees, and from contributing financial and other support to Employees' Representation Plan for H. E. Fletcher Co., and its adjunct, Employees of H. E. Fletcher Co., or to any other labor organization of its employees:

"(b) From in any manner giving effect to its agreement with its employees under Employees' Representation Plan for H. E. Fletcher Co.;

"(c) From in any other manner interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining and other mutual aid or protection, as guaranteed in Section 7 of the Act.

"2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

"(a) Withdraw all recognition from Employees' Representation Plan for H. E. Fletcher Co., and its adjunct, Employees of H. E. Fletcher Co., as the representative of any of its employees for the purpose of dealing with the respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment, completely disestablish Employees' Representation Plan for H. E. Fletcher Co., and its adjunct, Employees of H. E. Fletcher Co., as such representative, and disavow its contract therewith;

"(b) Immediately post notices in conspicuous places throughout its plant and maintain such notices for a period of thirty (30) consecutive days, stating (1) that the respondent will cease and desist as aforesaid, and (2) that the respondent will withdraw all recognition from Employees' Representation Plan for H. E. Fletcher Co., and its adjunct, Employees of H. E. Fletcher Co., as the representative of any of its employees for the purpose of dealing with the respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment that Employees' Representation Plan for H. E. Fletcher Co., and its adjunct, Employees of H. E. Fletcher Co., are disestablished as such representative, and that the respondent's agreement therewith is void and of no effect."

It was admitted by the respondent that there was little conflict as to the basic facts in the evidence, and that its real objection is directed to the conclusions of the Board. The facts as found by the Board are contained in the following summary:

That the respondent, a corporation organized in 1924, under the laws of the Commonwealth of Massachusetts, has its principal office and place of business in West Chelmsford, Massachusetts, where it is engaged in the quarrying, cutting, sale, and distribution of granite in the form of paving blocks, building work, curbing, rough granite, and crushed stone. The West Chelmsford plant consists of the quarry proper, a curb yard, stone sheds, service department, and a mill. For the purpose of moving the stone within the plant, the respondent maintains approximately five miles of trackage over which it operates its own steam engine and eight or nine freight cars. The respondent also owns a small quarry at Milford, Massachusetts, about 40 miles from West Chelmsford. Granite quarried at Milford is shipped to the West Chelmsford plant for further fabrication. With the exception of relatively small amounts of explosives and coal, which it procures within Massachusetts, the respondent requires no supplies other than the granite in its quarries.

From January, 1936, to September 11, 1937, the respondent sold 187,891 tons of stone valued at $1,416,995.57. Of this amount, 140,283 tons valued at $780,825.47 were shipped to points within Massachusetts, and 47,608 tons valued at $635,507.10 were shipped outside the State. Shipments outside Massachusetts amounted to 25.3 per cent of total shipments by tonnage, and 44.9 per cent by value. The great majority of shipments outside the State are made, f.o.b., quarry to customers in New York, Connecticut, Rhode Island, New Jersey, and the District of Columbia. At

the time of the hearing approximately 300 production and maintenance workers were employed by the respondent.

In the early nineteen hundreds the Union had organized a considerable number of granite workers and for some years prior to 1922 had succeeded in negotiating collective agreements with the respondent's predecessor as well as with many other quarries in New England. In April, 1922, the employers in the industry announced a general wage reduction and the adoption of the open shop or so-called "American Plan". This announcement resulted in numerous strikes and lockouts which continued until 1923 when practically all of the quarries in New England renounced their campaign for the open shop and again entered into collective bargaining contracts with the Union. The respondent's predecessor and several quarry operators in Vermont, however, still refused to recognize any labor organizations of their employees. In 1933 the Union called a strike at the respondent's plant for recognition, but after three months it was compelled to withdraw when the respondent imported strike-breakers from North Carolina.

The Board also found that in March, 1934, before the enactment of the Act, the respondent initiated and introduced the Plan to its employees; that the respondent's treasurer, Ralph A. Fletcher, and another person, now assistant superintendent of the respondent's business, called a meeting of the employees in the curb yard, described the Plan and told them to appoint a committee to consult further with Fletcher. Following the instructions of the said Fletcher, a committee consisting of two employees called similar meetings in other departments and advised the employees in each to nominate a representative to the Works Council. The representatives were elected and the Plan became operative by it terms. The Plan with a few amendments, discussed later, is still in operation. The Plan provides for a Works Council consisting of six employees' representatives, one elected from each department, and six representatives appointed by the management, to engage in collective bargaining and handling grievances.

The Board also found that the respondent participated both in the initiation and formulation of the Plan and that the respondent's influence was necessary before the employees made their decision to organize "an inside labor organization". The Plan provides that the Works Council hold regular bi-monthly meetings, two-thirds of the employee-representatives together with two-thirds of the appointed representatives constituting a quorum, and no business is to be conducted without a quorum. Elections held once a year are supervised by a committee of three, two selected by the employee-representatives and one by the management, although the respondent has never exercised its right to select a member of this committee. Candidates for election are required to be employees of the respondent. The Plan provides that the respondent provide suitable places for meetings of the Works Council and its committees; representatives in attendance at any meetings of the Works Council, or its committees, and employees required to attend any meetings at the request of the Works Council or any of its committees, shall receive their regular pay from the respondent for such time as they are absent from their work for those purposes. The Works Council is to take under consideration any matter concerning the employees and may appoint an investigating committee to investigate it or may decide the matter immediately by a two-thirds vote of the representatives present and voting. After a decision in the matter by the Works Council it is referred back to the Works Manager, who is apparently the executive head of the division in which the matter arises, for his report and upon receipt of the latter the Works Council is to immediately reconsider it and if it is unable to agree with the Works Manager, may, by a two-thirds vote refer the matter to the president, who is to report his findings to the Council. If, upon reconsideration, the Works Council is unable to agree with the president by a two-thirds vote, the matter is to be submitted to arbitration and machinery for the latter is provided in the Plan. No provision was made in the Plan for dues, nor were any collected up to April, 1937. The first chairman of the Works Council was Ralph A. Fletcher, the treasurer of the respondent, and the respondent's bookkeeper acted as secretary. There was never a general meeting of all the employees of the respondent, but from time to time employee-representatives held meetings of the employees of their respective department during lunch hours, either in the various departments, or in the commissary hall located on the premises. On March 29, 1934,

the respondent, through its appointed representatives on the Works Council, one of whom was Ralph A. Fletcher, the treasurer of the respondent, entered into an agreement with the elected representatives whereby the wage scale was increased by ten percent. This agreement or contract remained in operation, except for a five-cent raise given by the company in December, 1936, until April 30, 1937, when it was amended and extended to April 1, 1938, and a year thereafter.

In April, 1937, after the decision of the United States Supreme Court in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, a business agent of the Union came to the respondent's premises for the purpose of organizing its employees who were eligible to membership in the Union. The respondent refused to deal with the Union, assigning as its ground therefor, that it recognized and was dealing with the Plan. Meanwhile the contract referred to was extended as noted above. That in the latter part of April, the treasurer of the respondent telephoned the New York office of the League for Industrial Rights seeking advice as to whether the Plan was in violation of the Act in view of the decision of the Supreme Court in the Jones & Laughlin case, supra, and he was advised by its representatives to discontinue payments to the employee-representatives for meetings held after working hours and to charge rent for the use of the commissary hall for department meetings. That as a result of this advice the respondent discontinued payments to employee-representatives after working hours, but continued to reimburse them for time lost from work to attend meetings during working hours. Thirty-five cents an hour was charged thereafter for the use of the commissary hall, but no rent was charged for the use of the drafting room where the Works Council met. Immediately after Fletcher's talk with the representative of the League for Industrial Rights, an employee-representative and the chairman of the Works Council called a meeting of the employee-representatives, department meetings were held, and dues necessary to defray the expenses under the Plan were agreed upon. The secretary-treasurer of the respondent was appointed by the employee-representatives to collect dues of $2 a year and application cards for membership in the "Employees' Organization under the Employees' Representation Plan" were distributed and signed at the plant, in many instances during working hours.

The Board concluded that the Plan as an instrument for collective bargaining was nothing more than a "device foisted by the respondent upon its employees to give them the semblance, rather than the substance of collective activity." That the voluntary association referred to above as the Employees of H. E. Fletcher Co., was simply an instrument used solely for the collection of dues to support the Plan. That the Works Council is the creature of the respondent, limited in its activity by the requirement of the two-thirds vote of its membership, and that the employees were limited in that their elected representatives could not alter nor amend the Plan, because of the fact that such action would require a three-fourths vote of the Council, composed as it was of equal representation. That the respondent unquestionably has made the Plan its own representative and controls the Plan in every particular, and the Board further concluded that the respondent dominated and interfered with the formation of the Plan in 1934 and at all times since that time has dominated and interfered with its administration and contributed financial and other support to it, and it concluded, as a matter of law, that

"2. Employees' Representation Plan for H. E. Fletcher Co., together with its adjunct, Employees of H. E. Fletcher Co., is a labor organization, within the meaning of Section 2(5) of the Act.

"3. By its domination and interference with the administration of Employees' Representation Plan for H. E. Fletcher Co., and its adjunct, Employees of H. E. Fletcher Co., and by contributing financial and other support thereto, the respondent has engaged in and is engaging in unfair labor practices, within the meaning of Section 8(2) of the Act.

"4. By interfering with, restraining, and coercing its employees in the exercise of the rights guaranteed by Section 7 of the Act, the respondent has engaged in and is engaging in unfair labor practices, within the meaning of Section 8(1) of the Act.

"5. The aforesaid unfair labor practices are unfair labor practices affecting commerce, within the meaning of Section 2 (6) and (7) of the Act."

Upon these findings and conclusions, the Board issued the order set out above.

█ The first question raised by the respondent is that the Board was without jurisdiction in the matters presented, on the ground that the industry of the respondent was local in character and the operations of the respondent, if stopped by industrial trouble, would in no way obstruct or interfere with the free flow of interstate commerce. In view of the findings of fact of the Board concerning the nature of the respondent's operations in the industry in which it is engaged and which are supported by substantial evidence which make these findings conclusive under Section 10(e) of the Act and the long line of decisions that has recently come down from the Supreme Court, it would be purely an academic effort to discuss at length this point raised by the respondent. The contentions raised concerning the effect on interstate commerce by the cessation of the respondent's operations caused by industrial strife in a case with facts concerning operations similar to the present, and the other contention relative to the amount of interstate commerce affected, have been discussed in these cases at length, and in accordance with the principles laid down in them, it appears there is ample justification for the exercise of federal power, and the provisions of the Act are applicable to the operations of the present respondent. The respondent's motion to dismiss based on this ground was rightly denied. National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014; Consolidated Edison Co. et al. v. National Labor Relations Board et al., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 630, 81 L.Ed. 921, 108 A.L.R. 1352; National Labor Relations Board v. Jones & Laughlin Steel Corp., supra, National Labor Relations Board v. Lion Shoe Co., 1 Cir., 97 F.2d 448 and kindred cases. Cf. Valvoline Oil Co. v. United States et al., 60 S.Ct. 160, 84 L.Ed. ——. United States Supreme Court. November 13, 1939.

█ The respondent next argues that there is no substantial evidence to support the findings of fact made by the Board and the findings of fact do not support the conclusions of the Board that the respondent had engaged in unfair labor practices. The evidence, however, refutes the tenability of this contention. There was substantial evidence that the employees of the respondent, in February of 1934, before the passage of the Act, were desirous of starting an organization for the purpose of collective bargaining with the respondent; that, one Vasselin, an employee of the respondent, was the initiator, and this desire was evidenced by a petition drawn and signed by the employees to the effect that it was their wish "to form an organization for the purpose of bargaining with the company and debate grievances." There was considerable reluctance on the part of the employees to sign their names, but many of them finally signed, and the petition was shown to Mr. Ralph A. Fletcher, treasurer of the respondent company, and the latter, as he testified himself, "finally took the bull by the horns", went into that department and asked the men to assemble, and the said Fletcher suggested they select a committee to discuss matters with him, after some considerable discussion as to the various kinds of organizations that might be developed. A meeting took place and Fletcher, on behalf of the respondent, submitted plans to the committee. One of the plans submitted by Fletcher to the committee was finally adopted as the Plan by both the respondent and the committee; that this Plan, when the committee entered Mr. Fletcher's office for the purpose of discussing it, had all been written out and was explained to the committee by Fletcher, and the committee got "orders to go up and have a meeting in each department and talk it over with the men, and explain to the men what we are going to do and have the men point out candidates for nomination" as representatives. There was no vote taken at any time by the employees as to whether they would adopt the Plan, nor was any opportunity presented in this direction, and the Plan became effective by its terms upon the election of the representatives from each department. Copies of the Plan were made by the respondent on its own machines and distributed to the employees. By the terms of the Plan, the respondent was to provide suitable places for meetings of the Works Council and its representatives, and the latter would receive their regular pay for time spent in meetings of the Works Council or any of the committees. And there was no material change in the provisions of the Plan until April of 1937.

The fact that these events took place before the passage of the Act does not preclude the Board from consideration of

them in its determination of violations of the Act after its passage.

National Labor Relations Board v. Pennsylvania Greyhound Lines Inc. et al., 303 U.S. 261, 268, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138, 145; Jeffery-DeWitt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 139, 112 A.L.R. 948. And, as has been pointed out above, at no time since the passage of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. have the employees had a chance to vote on whether they wished to be represented as provided in the Plan. True, they have participated in the periodic election of representatives under the Plan. This, however, does not signify that they approve the Plan. Their only choice is to vote or not to vote, under the Plan. If they do not vote, representatives will be chosen by those who do, and these representatives will be recognized by the company as the sole bargaining agents for the employees.

Up to the time of the decision in the case of National Labor Relations Board v. Jones & Laughlin Steel Corp., supra, in April, 1937, the evidence showed that no dues were paid by the employees into the organization affected by the Plan; meeting places were provided by the respondent without charge, and the representatives of the employees were being paid for time spent in meetings during working hours and also regular pay was given those who attended meetings at night after working hours. A secretary was furnished the Works Council, who was employed as a clerk in the office of the respondent. There was never any meeting of all the employees of the respondent, although there were meetings in each department to which the representatives reported at different times.

After the decision in the Jones & Laughlin case, supra, the Union started to organize the employees of the respondent and, in pursuance of this, called upon Mr. Ralph A. Fletcher. The latter refused to deal with it. As a result of the advice received from the League for Industrial Rights, the respondent ceased paying the employees for time spent after working hours at night in meetings and made a charge of 35¢ per hour for the use of the hall of the respondent for departmental groups of employees. However, the practice of paying the representatives for time spent at meetings during working hours was continued. The evidence also showed that at about this time the employee-representatives of the Plan secured some legal advice from an attorney who served with compensation, and as a result, membership cards in the "Employees' Organization under a Plan of Representation" were issued and signed by most of the employees, and the employee-representatives elected under the Plan made arrangements to collect dues amounting to $2 per year to pay for the time that representatives put in after working hours in effectuating the purposes of the Plan.

It is plainly the fact that the Plan in 1934 was a creation of the respondent; it was its "brain-child"; its very provisions were advanced by it to the employees, and the latter were never given a chance to express their choice in reference to it. Since its inception the employees never met in a mass group to consider their problems. One would have to possess a marked degree of artlessness to arrive at contrary conclusions. And it needs no great imagination to lead one to the positive belief that when the respondent was apprised of the fact that the employees desired to form an organization for collective bargaining, it made hasty and immediate efforts to see to it that a company plan was adopted which would include and did include provisions as to voting power in the Works Council and for amendments to the Plan that made for a retention of control of this company union with respect to activities of the employees. The matter of payments to the representatives also presents an aspect of control. Candidates for election were required to be employees of the respondent, and even though the employees might desire to remove this restriction upon their choice of representatives, the change could not be made without the concurrence of employer-representatives on the Works Council. The whole picture both before and after the passage of the Act in 1935 is one of domination and interference. This is the type of case referred to in the case of National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc. et al., supra, 303 U.S. page 268, 58 S.Ct. page 571, 576, 82 L.Ed. 831, 115 A.L.R. 307, wherein the court, in substance, says that collective bargaining is a sham when the employer sits on both sides of the table by supporting a particular organization with which he

deals. The court in this case expresses itself further, 303 U.S. on page 270, 58 S.Ct. on page 576, 82 L.Ed. 831, 115 A.L.R. 307, in language which is applicable to the instant case, as follows:

"* * * But here respondents, by unfair labor practices, have succeeded in establishing a company union so organized that it is incapable of functioning as a bargaining representative of employees. With no procedure for meetings of members or for instructing employee representatives, and with no power to bring grievances before the Joint Reviewing Committee without employer consent; the Association could not without amendment of its by-laws be used as a means of the collective bargaining contemplated by section 7; and amendment could not be had without the employer's approval."

Nor was there any material change after the formation of Employees of H. E. Fletcher Co., in 1937. As argued by the petitioner this was no more nor less than "an adjunct of the Plan", a shell with no rights possessed by it to bargain collectively. In fact the Employees of H. E. Fletcher Co., in their motion to intervene described themselves as "functioning under the Employees' Representation Plan of the H. E. Fletcher Co." The membership cards and receipts for dues did contain the statement that it was an agency to bargain collectively but there was no evidence that it had, or was intended to have, any such powers. It had no constitution or by-laws, nor were its powers, rights and privileges expressed in any written document. It had no officers except a secretary-treasurer who was appointed by the representatives to the Plan and who was employed in the offices of the respondent as a bookkeeper. It was formed purely as an aid to relieve its parent—the Plan—of certain patent and admitted illegalities under the terms of the Act. It was supplemental to the Plan, which still operates. No control has been given up by the respondent by any change in the procedural methods in voting upon amendments to the Plan in determination of matters before the Works Council. Nor was any change instituted in reference to the presence of an equal number of representatives of the respondent in the Council. There was no change in the provision limiting the choice of representatives to fellow employees, no meetings of all the employees were held to discuss any matters, all the employees were regarded as bound by the Plan, and, in sum, there was little sincere effort to bring the Plan into harmony with the Act after the Jones & Laughlin decision. At best, there was an attempt to get rid of the features obviously in violation of the Act with the retention of those that still enabled the respondent to interfere with and dominate the rights of the employees to organize and bargain collectively through representatives of their own choosing, and to engage in concerted activities for that and other purposes, within the provisions of Section 7 of the Act. The danger of interference is still present. Experience leads to the conclusion that the slight efforts made by the respondent would not have the effect of freeing the Plan from the respondent's domination. The difficulty from a practical standpoint, that of human experience, is that the virus of control is not so easily washed out. To get rid of it, a complete destruction of the body it has lodged in is usually made necessary and with that body any feeble and ineffectual antidote in the form of a supporting organization administered to effect a cure. Such a proceeding is more salutary and presents the obvious possibilities involved in a fresh start. For the Board to conclude that there was need of such a remedy, was properly inferable from the facts that were presented in this case. The fact that there had been no major industrial troubles in the respondent's industry, does not insure their not happening in the future. National Labor Relations Board v. Jones & Laughlin Steel Corp., supra, 301 U.S. page 43, 57 S.Ct. page 615, 81 L.Ed. 893, 108 A.L.R. 1352.

We are led to the conclusion that the Board was clearly justified in making its findings of fact in this case and the latter fully sustain the conclusion reached by it that the respondent has engaged and is engaging in unfair labor practices by its domination and interference with the Plan, and that the organization designated as the Employees of H. E. Fletcher Co., is, as the Board designates it to be, an adjunct of the Plan, and the further conclusion is justified that the respondent violated the provisions of the Act by contributing financial and other support to the Plan and by interfering with, restraining, and coercing its employees in the exercise of the rights guaranteed by Section 7 of the Act to form for themselves a labor organization and to bargain collectively through representatives of their own choosing.

And the order of the Board, in view of the above, should be enforced. The provisions of the order embraced in paragraphs 1(a), (b), and (c) and 2(b) and (c) are valid under the decision of the Supreme Court in National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc. et al., supra. Also, the affirmative provisions of the order, 2(a), requiring withdrawal of all recognition from the Plan and Employees of H. E. Fletcher Co., and disestablishment of both organizations was proper in view of the above and in the light of the same decision of the Supreme Court. The court, in this case, said 303 U.S. at page 270, 58 S.Ct. at page 576, 82 L.Ed. 831, 115 A.L.R. 307:

"Whether the continued recognition of the Employees Association by respondents would in itself be a continuing obstacle to the exercise of the employees' right of self-organization and to bargain collectively through representatives of their own choosing, is an inference of fact to be drawn by the Board from the evidence * * *." Consolidated Edison Co. et al. v. National Labor Relations Board et al., supra; National Labor Relations Board v. Pacific Greyhound Lines, Inc., 303 U.S. 272, 275, 58 S.Ct. 577, 82 L.Ed. 838; Swayne & Hoyt, Ltd. et al. v. United States, 300 U.S. 297, 304, 307, 57 S.Ct. 478, 81 L.Ed. 659.

The court in the Greyhound case, supra, further said, 303 U.S. at page 271, 58 S.Ct. at page 576, 82 L.Ed. 831, 115 A.L.R. 307:

" * * * continued recognition * * * would serve as a means of thwarting the policy of collective bargaining by enabling the employer to induce adherence of employees to the Association in the mistaken belief that it was truly representative and afforded an agency for collective bargaining, and thus to prevent self-organization. The inferences to be drawn were for the Board and not the courts. * * * withdrawal of recognition of the Association by respondents, accompanied by suitable publicity, was an appropriate way to give effect to the policy of the Act."

The case of National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 60 S.Ct. 203, 84 L.Ed. —, decided by the Supreme Court, December 4, 1939, after this opinion was written, is further authority for the conclusions reached herein.

That part of the Board's order which directs that the respondent desist from giving effect to its contract with the Plan is valid. The contract at its birth was tainted with unfair labor practices and there was ample basis for the finding of the Board that the contract was the outcome of the domination and interference of the respondent over the Plan and was a consequence of the unfair labor practices, and it was within the power of the Board to order the respondent to cease giving effect to it. There could hardly be, with its existence, absolute freedom of the exercise of the rights of the employees to bargain collectively and effectuate the policies of the Act. It might hamper the employees in the exercise of those rights. Titan Metal Mfg. Co. v. National Labor Relations Board, 3 Cir., 106 F.2d 254; National Labor Relations Board v. National Motor Bearing Co., 9 Cir., 105 F.2d 652; National Labor Relations Board v. National Licorice Co., 2 Cir., 104 F.2d 655; Hamilton-Brown Shoe Co. v. National Labor Relations Board, 8 Cir., 104 F.2d 49; Cudahy Packing Co. v. National Labor Relations Board et al., 8 Cir., 102 F.2d 745; National Labor Relations Board v. Hopwood Retinning Co., Inc. et al., 2 Cir., 98 F.2d 97, 100.

The respondent relies upon the case of the Consolidated Edison Company v. Naional Labor Relations Board, supra, in support of its contention that the Board was without power to order the respondent to desist from giving effect to its contract with the Plan. But that case does not support its position. The facts in that case present an entirely different situation from those here. There the Brotherhood was a labor organization independently established as an affiliate of the American Federation of Labor and not in the control of the employer-company. All charges were withdrawn that the employer-company had dominated or interfered with the formation of any labor organization, or had contributed financial or other support to it. It is a totally different situation from that presented here. It was not shown there, as here, that the contract was a consequence of the unfair labor practices found by the respondent's control and domination of the labor organization.

A decree will be entered enforcing the order of the Board.