## NATIONAL LABOR RELATIONS BOARD v. SOMERSET SHOE CO.

### No. 3482.

Circuit Court of Appeals, First Circuit.

May 9, 1940.

---

PETERS, District Judge, dissenting.

Mortimer B. Wolf, of Washington, D. C. (Charles Fahy, Robert B. Watts, Laurence A. Knapp, Samuel Edes, and Mary Lemon Schleifer, all of Washington, D. C., on the brief), for the Board.

John J. Mahon, of Lewiston, Me. (Skelton & Mahon, of Lewiston, Me., on the brief), for Somerset Shoe Co.

Before MAGRUDER and MAHONEY, Circuit Judges, and PETERS, District Judge.

MAGRUDER, Circuit Judge.

The National Labor Relations Board petitions for enforcement of an order against Somerset Shoe Company dated May 17, 1939.[1] 49 Stat. 454 § 10(e), 29 U.S.C.A. § 160(e). Respondent is a Massachusetts corporation engaged in the manufacture and

---

[1] The order is as follows:

"On the basis of the above findings of fact and conclusions of law, and pursuant to Section 10(c) of the National Labor Relations Act, the National Labor Relations Board hereby orders that the respondent, Somerset Shoe Company, Skowhegan, Maine, and its officers, agents, successors, and assigns, shall:

"1. Cease and desist from discouraging membership in the United Shoe Workers of America, or any other labor organiza- tion of its employees, by discriminating in any manner in regard to the hire or tenure of employment of any of its em- ployees.

"2. Cease and desist from in any man- ner interfering with, restraining or co- ercing its employees in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bar- gain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of col-

sale of women's shoes, having a plant and head office at Auburn, Maine, and two plants at Skowhegan, Maine, where the alleged unfair labor practices occurred. Without doubt, respondent is subject to the National Labor Relations Act. 49 Stat. 449, 29 U.S.C.A. § 151 et seq. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, and companion cases; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014. This is conceded by counsel, and the jurisdictional facts need not be stated.

Upon a charge duly filed by the United Shoe Workers of America, hereinafter called United, a labor organization affiliated with the C. I. O., the Board issued its original complaint against respondent on August 13, 1937. The complaint alleged in substance that the production departments at the two Skowhegan plants together constitute an appropriate collective bargaining unit, and that since March 22, 1937, United has been the exclusive representative of all the employees in said unit by virtue of designation by a majority of the employees therein; notwithstanding which, on March

---

lective bargaining or other mutual aid and protection, as guaranteed in Section 7 of the National Labor Relations Act [29 U.S.C.A. § 157].

"3. Cease and desist from refusing to bargain collectively with United Shoe Workers of America as the exclusive representative of its Skowhegan employees, excluding supervisory and clerical employees, in respect to rates of pay, wages, hours of employment and other conditions of employment.

"4. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

"(a) Make whole all employees who were laid off by reason of the shut-down on March 24, 1937, for any loss of pay suffered by reason of such shut-down by payment to each of them of a sum of money equal to that which each would normally have earned as wages during the period from March 24, to May 11, 1937, less his or her net earnings, if any, during that period, deducting however from the amount otherwise due to each of the said employees monies received by said employee during said period for work performed upon Federal, State, county, municipal, or other work-relief projects and pay over the amount so deducted to the appropriate fiscal agency of the Federal, State, county, municipal, or other government or governments which supplied the funds for said work-relief projects;

"(b) Upon application, offer all persons in the employ of the respondent on March 24, 1937, who have not since been fully reinstated to their former or substantially equivalent positions at the respondent's Skowhegan Plants, Nos. 1 and 2, or at any other plant which the respondent may acquire or operate in the future, without prejudice to their seniority and other rights and privileges in the manner set forth in the section entitled 'The Remedy' above, placing those employees for whom employment is not immediately available upon a preferential list in the manner set forth in said section; and thereafter, in said manner, offer them employment as it becomes available; and make whole said employees for any loss of pay they may suffer by reason of any refusal of reinstatement or placement upon the preferential list, by payment to each of them of a sum of money equal to that which each would normally have earned as wages during the period from five (5) days after the date of application to the date of the offer of reinstatement or placement upon the preferential list, less his or her net earnings during said period; deducting, however, from the amount otherwise due to each of the said employees, monies received by said employee during said period for work performed upon Federal, State, county, municipal, or other work-relief projects and pay over the amount so deducted to the appropriate fiscal agency of the Federal, State, county, municipal, or other government or governments which supplied the funds for said work-relief projects;

"(c) Upon request, bargain collectively with United Shoe Workers of America, as the exclusive bargaining representative of its Skowhegan production employees, excluding supervisory and clerical employees;

"(d) Post immediately notices to its employees in conspicuous places through its plants stating that the respondent will cease and desist in the manner aforesaid, and maintain such notices posted for a period of at least sixty (60) consecutive days from the date of posting;

"(e) Notify the Regional Director for the First Region in writing within ten (10) days from the date of this order what steps the respondent has taken to comply therewith."

That portion of the Board's decision entitled "The Remedy" referred to above in paragraph 4(b) of the order is as follows:

"The employees whom we have found to have been locked out on March 24, 1937, are entitled also to reinstatement upon application. We shall order the re-

22, 1937, and at all times thereafter, respondent has refused to bargain collectively with United as such representative, in violation of subdivisions (1) and (5) of Section 8 of the National Labor Relations Act, 29 U.S.C.A. § 158(1, 5). By amendment made at the hearing, the Board complained of an additional unfair labor practice, in that respondent "in its Skowhegan Plants on or about March 24, 1937, although it had plenty of business at said time, did lock out its employees * * * in order to coerce, discourage and prevent said employees from designating the United * * * as their representative for collective bargaining", in violation of subdivisions (1) and (3) of Section 8 of the Act. The Board has found that respondent committed the unfair labor practices, as charged.

Labor unrest manifested itself among the wholly unorganized employees at the Skowhegan plants early in January, 1937. Dissatisfaction with wage rates led to two or three brief strikes, which were settled, temporarily, with the assistance of federal and state conciliators. After one of these settlements was negotiated, January 20, 1937, the men decided to organize, and formed themselves into the Skowhegan Shoe Workers' Association, an unaffiliated organization. A majority of the production employees in the two plants joined. About February 1 individual wage adjustments were made, but the men were not satisfied with the way the management had carried out the agreement. Mr. Bowler, the general superintendent of the plants at Auburn and Skowhegan, had a conference with officers of the Association, in the presence of conciliators, and certain points of agreement were arrived at. This was on or about March 1. On the same night, the agreement was read to a mass meeting of the Association, but was not favorably received. A motion to call in a C. I. O. organizer was unanimously carried. Accordingly a telegram in the name of the Skowhegan Shoe Workers' Association was sent on March 3 to organizers for United then at Lewiston, Maine, requesting them to attend a mass meeting of the Association to be held the following day. This is not the picture frequently painted, of a happy family disrupted by outside agitators, but on the contrary, an unhappy family calling in organizers of a national labor union to help them.

At the mass meeting on March 4 the employees were addressed by one Nolan, a United organizer. Application cards for membership in United were distributed and 89 signatures were secured. These cards read: "I, the undersigned, hereby apply for membership in the United Shoe Workers of America of the C. I. O. and authorize its officers to represent me in negotiations with my employer for the purpose of collective bargaining on wages, hours, grievances, and conditions of employment." During the following week more application cards for membership in United were passed around the shop by dues collectors for the old Skowhegan Shoe Workers' Association and additional signatures were obtained. Still more applications were

---

spondent to offer reinstatement to their former or substantially equivalent positions at the respondent's Skowhegan Plants, Nos. 1 and 2, or at any other plant which the respondent may acquire and operate in the future, to those employees who have not been since fully reinstated. Such reinstatement shall be effected in the following manner: All persons, now employed by the respondent at its Skowhegan Plants, Nos. 1 and 2, or who may be employed by the respondent at any plant which it may acquire and operate in the future, who were not employees of the respondent on March 24, 1937, shall if necessary to provide employment for all those who were employees of respondent on March 24, 1937, be dismissed. If there is not sufficient employment then immediately available for all persons who were employees on March 24, 1937, all available positions shall be distributed among such employees in accordance with the respondent's usual method of operation under curtailed production, without discrimination against any employee because of his union affiliation or activities, following a system of seniority to such extent as was applied in the conduct of the respondent's business prior to March 24, 1937. Those employees remaining after such distribution, for whom no employment is immediately available, shall be placed upon a preferential list prepared in accordance with the principles set forth in the previous sentence, and shall thereafter, in accordance with such list, be offered employment in their former or in substantially equivalent positions, as such employment becomes available because of the opening of Plant No. 2 or because of the acquisition and operation of any newly acquired plant or for any other reason, and before other persons are hired for such work."

signed at mass meetings on March 12 and March 18. By March 18, 362 workers had signed up, a clear majority of the 485 production employees in the two Skowhegan plants according to respondent's payroll of March 10. It was testified that these mass meetings were called by the Skowhegan Shoe Workers' Association, were limited to employees of respondent, and that persons attending had to show their Association membership cards. It was further testified that at the meeting on March 18, at which about 300 persons were present, it was moved and unanimously carried that Messrs. Nolan and Lawless, organizers for United, should go to the plant and request the management to recognize United as the bargaining representative. The next day this committee was unable to see Mr. Thomas O'Byrne, the president of respondent, for he was not at the Skowhegan plant that day. Accordingly, on March 22, 1937, United mailed a letter from its Boston headquarters, addressed to Mr. O'Byrne, stating that United "has now signed application cards for membership in our union of a majority of the shoe workers employed in the Somerset Shoe factories— Nos. 1 and 2", and requesting a conference to discuss a union agreement at the earliest possible date. The Board states that this request to bargain was received by the respondent on March 29, 1937. What apparently happened was that when the letter arrived at Skowhegan the plants there had been closed down and the letter was forwarded to the head office of respondent at Auburn. Respondent never made any answer, never sought to verify the claim that a majority of its employees had designated United as bargaining agent.

Meanwhile, on March 5 Mr. Bowler, the general superintendent, started to curtail production at the Skowhegan plants. He stopped putting new work into the cutting room where the first work in the production of shoes is performed. As work in process moved through the factory various groups of employees, beginning with the cutters, were laid off as their work was completed. Finally when all the work in process was finished both plants shut down production on March 24 for an indefinite period. The employees were not discharged. Mr. Bowler himself testified that "We didn't regard them as discharged." Thereafter the local paper published the statement that the plants would remain closed until "local shoe workers agree to abandon outside affiliations". The news article attributed this statement of policy to "an official of the Somerset Shoe factory". The official was Mr. Bowler.[2]

On April 12 factory No. 1 was reopened for a few days for the purpose of making samples, preparatory to opening up in full production. About sixteen workers returned for this purpose. On April 15 the United members decided they would con-

---

[2] On April 1, 1937, a news article appeared in the Independent Reporter, Skowhegan, Maine, entitled "Shoe Factories Closed for Indefinite Period". A paragraph of this article read: "Somerset Shoe Company stands ready to deal with a local union or with individual employees in the matter of alleged grievances, but will not recognize C. I. O. or any outside organizations it was said. Until such time as local shoe workers agree to abandon outside affiliations these plants will remain closed." The editor of the paper testified positively that this statement of policy was obtained from Mr. Bowler, the general superintendent.

On Mr. Bowler's direct examination he was asked about this paragraph as follows:

"Q. I call your attention to the last paragraph of the exhibit which states that the Somerset Shoe Company stands ready to deal with a local union but will not recognize C. I. O. or any outside organization. Do you know anything about the source of that? A. I probably made a statement very much to that effect.

"Q. And will you tell us what your statement was based on? A. We wanted to deal with what we considered a reputable organization."

On cross examination of Mr. Bowler the following occurred:

"X–Q. Did I understand you to admit on direct examination that you stated to Mr. Rounds that the Somerset Shoe Company 'will not recognize the C. I. O.'? A. I stated that. Yes. I didn't state it in that many words or in that language as it is put there.

"X–Q. But in whatever words you stated it, that is what you said? A. In my conversation with Mr. Rounds I simply reiterated the remark that Mr. O'Byrne had already made—that he would never operate a factory under a C. I. O. contract.

"X–Q. And you also said to him in some language or other that until such time as local shoe workers agree to abandon outside affiliations these plants will remain closed? A. Yes."

sider themselves on strike because of the respondent's refusal to bargain and started to picket plant No. 1.

About this time a "citizens' committee" made its appearance. The committee consulted with the management and obtained a list of the employees. Mr. Bowler testified that "We had a vague idea of the general campaign that was under way", that is, a "back to work" movement. The committee mailed to each employee a printed circular and a ballot. The circular emphasized the loss which the town stood to suffer if its shoe factories should remain closed. The committee stated that "before it can proceed intelligently it is necessary that it know positively the attitude of the shoe workers of Skowhegan". Accordingly, the ballot, which was secret, asked three questions, the first of which was "Do you favor a local union or a union with national affiliations?" The other two questions asked the employee to express himself on whether efforts should be made to persuade the Somerset Shoe Company to reopen. There is no evidence as to the result of this ballot. When the citizens' committee received a substantial number of applications from employees who desired to return to work they gave a list of applicants to the management, which on May 10 called a meeting of employees at which Mr. O'Byrne stated that if enough people manifested their willingness to work, the plant was ready to be reopened. There was a practically unanimous showing of hands from the 150 employees present. The plant was reopened on the next day, May 11, and men who applied were taken back without discrimination.

Upon the reopening, application blanks were circulated throughout the plant for membership in a new unaffiliated labor organization, the Pine Tree Shoe Workers' Association. The charter members of this association were the 16 employees who had been working during the middle of April making samples. On July 23, 1937, the Pine Tree Shoe Workers' Association addressed a letter to the "Somerset Shoe Company, Auburn, Maine", asking to be recognized as the exclusive representative of all the employees of the company at Skowhegan, enclosing a typewritten list of members. This letter was not mailed, but the attorney for the Association presented it on the same day to Mr. O'Byrne in Skowhegan; whereupon Mr. O'Byrne, again on the same day, and in marked contrast to the company's attitude displayed in the case of the similar request by United, delivered a letter to the attorney for the Association stating that upon checking the names submitted it was found that the Association had a majority of the employees and therefore that the company recognized the Association as the exclusive representative. But there is no evidence that the Association ever proceeded to bargain with respondent.

■ The Board was warranted in finding that on and after March 18, 1937, United was the duly designated representative of the production employees in the two Skowhegan plants. A list of 485 workers who had signed application cards for membership in United was introduced into evidence, verified under oath by a witness as having been transcribed from the names on the cards. The original application cards were produced at the hearing and respondent was afforded an opportunity to check the cards with the list. Respondent now urges that the burden of proof is upon the Board to establish that the signatures on the application cards were the genuine signatures of the employees. But in view of the testimony of witnesses as to what took place at the various mass meetings of respondent's employees, above mentioned, and their testimony that the signatures were obtained in the plant and at these mass meetings, we think enough has been shown to put the burden on respondent of going forward with evidence tending to challenge the authenticity of the signatures, which could readily have been checked against the signatures of the employees on respondent's payroll, had there been any real question as to their genuineness. We agree with the Board that "in the absence of evidence to the contrary an application for membership in a labor organization may be considered as a designation of the labor organization as the applicant's representative for the purposes of collective bargaining". It cannot be said that the Board's finding had no substantial evidence to sustain it. National Labor Relations Board v. Waterman Steamship Corp., 60 S.Ct. 493, 84 L. Ed. ——, February 12, 1940.

No question is raised as to the appropriateness of aggregating the production employees of the two Skowhegan plants into one bargaining unit. National Labor Relations Board v. Lund, 8 Cir., 103 F.2d 815, 819; National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 866.

■ The Board was further warranted in finding that respondent had failed and refused to bargain collectively with the chosen representative of its employees, in violation of the Act. It is clear that the fixed policy of the management was not to deal with an outside organization. This is apparent from the testimony of Mr. Bowler, the general superintendent, both in direct and cross-examination.[3] At one point in his testimony Mr. Bowler sought to draw a distinction with reference to the statement made by President O'Byrne that he would never operate a plant under a C. I. O. contract. Mr. Bowler testified: "He said he wouldn't operate a factory under a C. I. O. contract, but he didn't say he wouldn't bargain with them." Of course the whole end and aim of collective bargaining is to reach an agreement, if possible. An advance determination by the company that it would never operate under a C. I. O. contract would render futile any bargaining negotiations with United. "It is obvious that an employer who enters into negotiations with a labor union representing his employees, with his mind hermetically sealed against even the thought of entering into an agreement with the union, is guilty of refusing to bargain collectively with the representatives of his employees in good faith, as required by the Act, and is therefore guilty of an unfair labor practice." National Labor Relations Board v. Griswold Mfg. Co., 3 Cir., 106 F.2d 713, 723; National Labor Relations Board v. Highland Park Mfg. Co., Circuit Court of Appeals, Fourth Circuit, March 11, 1940, 110 F.2d 632.

In fact, the company never even went through the motions of negotiating with United, but utterly ignored its formal request for a bargaining conference.

■ The fact that the plant was shut down did not absolve the company from the obligation to bargain with the representative of its employees. National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381; Jeffery-De Witt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 112 A.L.R. 948. This is particularly true where the shutting down itself was an unfair labor practice as was found by the Board. Furthermore, even from the company's own point of view, it regarded the employees as having been laid off, not discharged, at the time of the shutdown, and hence was obligated to deal with their chosen representative as to the terms and conditions of reopening, instead of sitting back while a "citizens' committee" conducted a campaign of attrition against the membership of United.

■ Nor can the company offer as an excuse for failure to bargain that when the written request of March 22, 1937, was received the company had no proof that United then represented a majority of the employees. In National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, at pages 868, 869, the court said: "The respondent answers that it had no official or conclusive information that the Joint Board was the duly accredited bargaining representative of the men, and that it could not have had until the Labor Board had itself so decided. * * * In the case at bar even though the respondent were in doubt as to the Joint Board's authority, that doubt did not excuse it; for it is quite plain that its position was not based upon any doubt, but upon its unwillingness to treat with 'outside' representatives of its employees; that is to say, to recognize the solidarity of the craft as such. The greater included the less, and having taken that position, it may not now say that it could not know whether the Joint Board was properly accredited. Had that been the real reason for its refusal, presumably it would have been persuaded by the evidence which the Joint Board could have presented. It made no effort to learn the facts and took the chance of what they might be."

The respondent claims that there is a fatal flaw in the Board's finding that it locked out its employees on March 24 in violation of the Act, as charged in the amended complaint. It is urged that the decision which ultimately resulted in the closing down was made on March 5, when Mr. Bowler stopped putting new work into the factories. Mr. Bowler testified that this decision on March 5 had no connection with United, whose organizer had only arrived on the scene the night before. He testified that the disturbed labor conditions beginning early in January had resulted in lowering the quality of the output and increasing operating costs; that in January the company began curtailing purchases of raw materials in anticipation of a possible shutdown.

---

[3] See footnote 2, supra.

The Board's findings make no reference to March 5 as a significant date, nor to the fact that the layoffs were progressive from March 5 to March 24 when all production ceased. The Board's brief takes note of this discrepancy, saying that "in finding that the lockout occurred on March 24, 1937, the Board appears to have erred", and contending that as to each employee the lockout occurred on the date during March upon which his work ceased.

The difficulty with this suggestion is that a layoff as such is not necessarily an unfair labor practice, and only becomes such upon a finding that the layoff was motivated by a purpose forbidden by the Act. The Board has made no finding that respondent had such a forbidden purpose on March 5, when the layoffs began. It is not the function of the reviewing court to supply missing findings of fact. Evidence which would warrant a finding that respondent had a forbidden purpose of March 24 obviously would not compel a finding that such purpose existed three weeks earlier.

But respondent is in error in supposing that the assumed absence of a forbidden purpose on March 5 conclusively establishes the shutdown as not in violation of law. It was not inevitable on March 5 that there would be a shutdown on or after March 24. Respondent could at any time have started new work through the plants. This could have been done on March 24; instead of which, respondent took a decision then to allow production to cease altogether. By this time United had secured a majority. Respondent's officials may not have known the exact membership claimed, but they could not have been ignorant of the fact that United had made significant headway. Considering the frank testimony of Mr. Bowler as to what he told the local newspaperman at or about the time of the closing, and the other facts in the case, we cannot say that the Board had no substantial basis for finding that the decision on March 24 to close down

production was actuated by a purpose to interfere with the self-organization of its employees. Thus in violation of law respondent deprived of employment not only those employees who had been working up to March 24 but also those who had been laid off previously in the progressive stages of the shutdown, but who continued to be employees because they were not discharged. Had new work been started through on March 24, though those men would not have all been working on that day, in normal course they would all have been called back from time to time as the new work reached their respective departments, provided production returned to the level of March 5.

A reinstatement order is appropriate in these circumstances. Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Hopwood Retinning Co., 2 Cir., 98 F.2d 97. The terms of paragraph 4(b) of the order are within the Board's broad discretionary power to devise appropriate affirmative relief. Republic Steel Corp. v. National Labor Relations Board, 3 Cir., 107 F.2d 472, 478, 480, enforcing an order in similar terms. 9 N.L.R.B. 219, 403. The order does not require respondent to give present employment to more men than it needs, at the current level of production; the remainder are to be put on a preferential list. In our decree we shall modify paragraph 4(b) of the order to the extent of making clear that the employees to be reinstated or put upon a preferential list are all those who had been working prior to March 5, when the plants were running full blast, and not merely those who were actually working on March 24.

We cannot now enforce paragraph 4(a) of the Board's order making an award of back pay for the period from March 24 to May 11, 1937. The Board's explanation of this portion of the order is set forth in the footnote.[4] On the record as it stands we cannot ascertain the date

---

[4] "When employees voluntarily go on strike even in protest against unfair labor practices, it has been our policy not to award them back pay during the period of the strike. The commencement of the strike in the instant case, however, did not terminate the respondent's obligations to make payments of back pay, since at the date of the strike the lock-out was still in existence and the strike had no effect on the situation. The strike became effective only when the respondent opened Plant No. 1 for production on May 11, 1937, and indicated that jobs were available for the employees. We will, therefore, order the respondent to make whole all of its employees for any loss of pay they may have suffered

from which back pay should commence. As previously pointed out, the Board in its argument before us urges that the lockout was a progressive one, beginning with the first employees who were laid off on March 5. But the Board has made no finding of an unfair labor practice prior to March 24. If on that day the employer had chosen not to close down, but to start new work through the plants, the cutters would have had employment, but there would have been no work for the employees in other departments to do until some unascertained dates within the next three or four weeks. It could not be said therefore that the unfair labor practice on March 24 immediately had the effect of depriving these employees of wages which they otherwise would have earned. It also appears that at the time of the hearing (August 23, 1937) plant No. 2 at Skowhegan had not been reopened. From the date of reopening plant No. 1, May 11, employment in that plant picked up gradually until at the date of the hearing there were 300 employees. Assuming, as we must on this record, that there was no unfair labor practice before March 24, 1937, if the employer had not on that day shut down for a forbidden purpose but had started new work through the plants it is difficult to say how far the loss of momentum from the previous curtailment of production during March would have delayed the reemployment of the full complement of employees who had been working on March 5. We could hardly assume that this whole group of employees would have been back at work in the same interval of time after March 24 as it had taken production to run down to zero from March 5 to March 24. Some of the employees, probably a majority, would have been back at work in that time, but we cannot tell which ones.

Another point deserving consideration in connection with the back pay order is the effect of the strike and picketing commencing April 15. It is the Board's theory that the strike did not become effective while the lockout lasted, and hence that the strikers are entitled to back pay until May 11 when the plant reopened.[5] But if the existence of the strike and picketing delayed the reopening, because prior to May 11 respondent could not get sufficient workers to warrant resumption of production, it could not be said that the strike became effective only on May 11.

■ Perhaps the Board, if permitted to reopen the case for further testimony on this phase, could make clarifying findings upon which an order for back pay might be based. We have power, while decreeing enforcement of the Board's order in part, to remand the case to the Board for further proceedings as to the other parts of the order. Ford Motor Co. v. National Labor Relations Board, 305 U.S. 364, 373, 374, 59 S.Ct. 301, 83 L.Ed. 221; Agwilines, Inc. v. National Labor Relations Board, 5 Cir., 87 F.2d 146, 155; National Labor Relations Board v. Bell Oil & Gas Co., 5 Cir., 91 F.2d 509, 515; National Labor Relations Board v. Lund, 8 Cir., 103 F.2d 815, 821; National Labor Relations Board v. National Motor Bearing Co., 9 Cir., 105 F.2d 652, 657. Therefore, before entering a final decree as to paragraph 4(a) of the Board's order, either affirming, modifying, or setting it aside, we think this portion of the case should be remanded to the Board for further proceedings. If the Board holds additional proceedings and issues a clarifying order as to back pay, such additional proceedings and order shall be made a supplemental part of the pending record for our final action and decree.

■ Paragraph 4(c), requiring respondent, upon request, to bargain collectively with United, should be enforced. Prior to the unfair labor practices United was the freely chosen representative of a majority of the employees and entitled under the Act to recognition as the exclusive bargaining agent. It may be that the lockout and the company's unlawful refusal to recognize United have dissipated much of its strength, but respondent cannot be allowed to profit by its own wrong. It is clear that many of the employees who had joined United signed up later with the Pine Tree Association without, however, so far as appears, withdrawing their designation of United as their bargaining representative. The Board might well conclude that the only way to wipe out the effect of the unfair labor practices is to reinstate United as the exclusive bargaining representative. National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 870; National Labor Relations Board v. Colten,

---

by reason of the lock-out by payment to each of them of a sum of money equal to the amount which each normally would have earned as wages from March 24,

1937, to May 11, 1937, less his or her net earnings during such period."

[5] See footnote 4, supra.

6 Cir., 105 F.2d 179. After a sufficient interval, the constraint upon respondent's employees consequent upon its unlawful acts may be assumed to have lifted, and the Board may have occasion to make another determination of their free choice of bargaining agent.

■ The requirement in paragraph 4 (d) of the posting of notices that respondent will cease and desist from the aforesaid unfair labor practices was warranted. "Knowledge on the part of the men that the company would cease and desist from hampering, interfering with and coercing them in selection of a bargaining agent, which the Board found the company had done successfully in the past, was essential if the employees were to feel free to exercise their rights without incurring the company's disfavor." National Labor Relations Board v. Falk Corp., 308 U.S. 453, 60 S.Ct. 307, 312, 84 L.Ed. ——, January 2, 1940; Republic Steel Corp. v. National Labor Relations Board, 3 Cir., 107 F.2d 472, enforcing an order in similar terms (9 N.L. R. B. 219, 403). See National Labor Relations Board v. Brown Paper Mill, 5 Cir., 108 F. 2d 867, 871. See also discussion and cases cited in the majority and minority opinions in Art Metals Const. Co. v. National Labor Relations Board, 2 Cir., 110 F.2d 148, 151–154.

■ The cease and desist portions of the order (paragraphs 1, 2 and 3) are in a form frequently approved by the courts as appropriate to the types of unfair labor practices here involved. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Jeffery-De Witt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 112 A.L.R. 948; National Labor Relations Board v. H. E. Fletcher Co., 1 Cir., 108 F.2d 459; National Labor Relations Board v. National Motor Bearing Co., 9 Cir., 105 F.2d 652, 660, 661.

A decree will be entered enforcing paragraphs of the Board's order numbered 1, 2, 3, 4(b) (with the modification indicated in this opinion), 4(c), 4(d) and 4(e). As to paragraph 4(a) the case is remanded to the Board for further proceedings not inconsistent with this opinion.

PETERS, District Judge (dissenting).

I do not concur with the views of the majority of the court as to the necessity of the proposed decrees.

The affirmative action ordered by the Labor Board, enforcement of which is asked for, is almost wholly predicated upon the finding of the Board that the shutdown of March 24, 1937, was for the purpose of interfering with the free right of its employees to choose their own organization and bargaining agent,—particularly to discourage their adherence to the C. I. O. connection. If such was the purpose of the shutdown; if it was for the purpose of coercing and interfering with the free action of the employees, it would be an unfair practice under the statute. However, I am unable to satisfy myself from the record that there was sufficient substantial evidence to support such a finding. It cannot be doubted that the introduction of the C. I. O. into the picture was wholly displeasing to the managers of the factory,—as it apparently turned out later to be unsatisfactory to the employees,—and it might naturally be thought that the shutdown was a manifestation of displeasure; and it may be that the management was not adverse to such a conclusion being drawn; but if that was only an incidental effect of their action, and if their determination to shut down was for good reasons other than involving coercion of employees, there is not sufficient ground for the imposition of the heavy penalties which the Board has ordered.

The reasons given by the management for the shutdown,—disturbed labor conditions, beginning early in the year, affecting unfavorably the quality and quantity of the output,—are as readily believable as that it was for the purpose of interfering with the rights of employees under the Act. No discrimination is shown at any time in the attitude of the respondent toward its employees on account of their union affiliations.

The Board says that it is "convinced" that the closing of the plants was for the purpose of coercing the employees. Others, considering the evidence, might become convinced that the shutdown was determined upon by the management for valid business reasons. The purpose is a matter of inference, and, if one inference can be drawn as well as another, neither is proved.

I agree that there was evidence to support a finding that at one time, after the employees called in the outside agency, or C. I. O., that organization represented a majority of the respondent's employees. Also that there was a refusal to bargain

with the C. I. O., not especially because of failure to answer a letter which the director of the C. I. O. sent to the respondent, but because from all the evidence it is manifest that the C. I. O. was in such disfavor with the respondent that the respondent was unwilling to bargain with it. But I fail to see sufficient ground for now directing the respondent to bargain with that organization. It seems to me there is as much reason for directing bargaining with the Pine Tree organization as with the outside unit. The evidence appears to be uncontradicted that the Pine Tree organization had received the support of a great majority of the employees at the time of the hearing before the Board, and that the C. I. O., although originally called in, had been displaced by their own locally formed union.

I assume that the purpose of the Act is to give workers full liberty to make their own choice, which purpose would seem to be defeated by ordering recognition of the outside organization in this case. The proceeding is supposed to be in the interest of the employees, and not primarily for the benefit of the C. I. O. I cannot think that the full liberty of action guaranteed the workers would be promoted by now ordering them to be represented by the outside group. Nor do I think that the change of attitude on the part of employees was brought about by an illegal attitude of the respondent; rather, by more mature consideration of their own welfare.

In my view the fundamental worthy purposes of the Act are best promoted in this case by dismissing the petition, there being really nothing to be gained now by enforcing the "cease and desist" part of the Board's order.