## NATIONAL LABOR RELATIONS BOARD v. CHRISTIAN BOARD OF PUBLICATION.

### No. 464.

Circuit Court of Appeals, Eighth Circuit.

July 25, 1940.

Allen Heald, of Washington, D. C., Atty. for National Labor Relations Board (Charles Fahy, General Counsel, Robert B. Watts, Associate General Counsel, Laurence A. Knapp, Asst. General Counsel, and Ernest Cook, Atty. for National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Francis M. Curlee, of St. Louis, Mo. (Richard F. Moll, of St. Louis, Mo., on the brief), for respondent.

Before WOODROUGH and THOMAS, Circuit Judges, and BELL, District Judge.

THOMAS, Circuit Judge.

Upon a complaint based upon charges filed by the Allied Printing Trades Council of St. Louis, Missouri, a labor organization affiliated with the American Federation of Labor and hereinafter referred to as the Council, the National Labor Relations Board found that respondent, Christian Board of Publication, has dominated and interfered with the formation of a labor organization of its employees designated as the Employees Committee. 49 Stat. 449, 452, § 8(1, 2), 29 U.S.C.A. § 158(1, 2).

The Board petitions for enforcement of its order that respondent (1) cease and desist from: (a) dominating or interfering with the Employees Committee; (b) giving effect to any contract entered into with the Employees Committee; (c) interfering with the employees in the exercise of the right of self-organization; and (2) that the respondent take the following affirmative action: (a) withdraw all recognition of the Employees Committee as the representative of any of its employees for purposes of collective bargaining and completely disestablish the Committee as such representative; (b) post appropriate notices and (c) notify the Regional Director of compliance with the order within ten days of the date of issuance.

The respondent has refused to comply with the order on the grounds (1) that the Board's findings are not sustained by the evidence and (2) that the Board is without jurisdiction to order the disestablishment of the Employees Committee and the voidance of its contract with respondent in view of the fact that the Committee was not made a party in the proceedings before the Board. Jurisdiction of the Board and of this court is conceded other than in the respect heretofore mentioned.

1. The respondent does not attack the accuracy of the particular findings of fact of the Board. The contention is that the inferences and conclusions drawn from these facts are unwarranted, capricious and contrary to the evidence. Summarizing the Board's findings the facts appear as follows.

The respondent, Christian Board of Publication, is a corporation organized under the laws of the State of Missouri governing the incorporation of religious, charitable, eleemosynary, fraternal, and other similar organizations organized not for profit. The sole offices and plant are located at St. Louis, Missouri, where it is engaged in the business of printing, publishing and selling religious books and pamphlets. It also publishes some medical books and journals, and does a small amount of job printing. The respondent's products amount in value to approximately $600,000 per year, of which approximately 45 per cent are sold and transported outside the State of Missouri. During normal periods the respondent employs approximately 165 persons, including 112 to 115 production employees, composed chiefly of compositors, mailers, pressmen, feeders and bookbinders. The production employees were found to constitute an appropriate unit for purposes of collective bargaining.

In February, 1937, a group of pressmen, not individually identified by the evidence, started the circulation of a petition to the respondent, requesting a general increase in the prevailing wage scale to a point within $2 a week of the standard Union wage scale in St. Louis. The request contained in the February petition was denied by respondent but a smaller increase, amounting to five per cent or less, was put into effect. No labor organization was in existence in respondent's plant at that time.

Sometime after May 11, 1937, the Council made its initial effort to organize the respondent's employees and a substantial number of them signed authorization cards designating the Council as their collective bargaining representative. However, as early as April, 1937, the Council had endeavored to negotiate a contract with the respondent providing for a closed shop and the Union wage scale. Between April 13 and June 8, 1937, the Council and the re-

spondent held four unsuccessful conferences, the respondent contending that it could not pay the Union wage scale and could not operate its plants under a closed-shop contract. No agreement was reached, the Council refusing to compromise its demands.

On June 10 and 11, 1937, the respondent with the aid of Price, Waterhouse & Co., certified public accountants, conducted an election among its employees for the purpose of determining their choice of collective bargaining representatives. Just prior to the election the respondent's officers addressed the employees, advising them that it was immaterial to the respondent whom the employees designated as their bargaining agency, and that they should vote as they desired without fear of discrimination. The ballots, which were prepared by the respondent, enabled the employees to vote "For Unions Affiliated with Allied Printing Trades Council", or "For Company Union", or "For Present Method". The results of the election were as follows:

For Unions Affiliated with Allied
Printing Trades Council........ 62
For Company Union............ 24
For Present Method........... 29
Void ........................ 6

Total ...... 121

The respondent made no formal announcement of the results of this election but the outcome soon became known throughout the plant.

Sometime during the week following the election a group of five pressmen constituted themselves a committee under the leadership of one Shull. These men called upon the respondent's plant superintendent and requested a wage increase in accordance with the request contained in the February petition. The plant superintendent told them that he could not bargain with them unless they represented a majority of the employees. Accordingly they circulated, during working hours, a petition referred to as the "Yes and No" petition, which reads as follows: "Will you be satisfied to receive a raise in salary to the extent of $2.00 below the Union scale, said salary to remain within this margin in proportion to the Union scale?"

The "Yes and No" petition was passed from hand to hand among the employees, including foremen and other supervisory employees. There is some evidence, as found by the Board, that certain of the supervisory employees took an active part in circulating the petition and in soliciting support for it. After sixty-eight employees had written the word "Yes" on the petition the committee of five pressmen showed it to the respondent's plant superintendent sometime between June 11 and June 19 and claimed by virtue thereof the right to represent the employees for the purpose of collective bargaining. It does not appear from the record whether or not the superintendent recognized their claim at that time.

Thereafter, at the suggestion of Shull, the employees in each department selected a representative to act for them in negotiations with the respondent. This was done informally by conversations among the men, no election being held. On June 19, 1937, the committee of five pressmen, having obtained the superintendent's permission to use the plant assembly room, called a meeting of the employees. This meeting over which Shull presided was attended by about fifty employees including the Employees Committee, the members of which attended as "instructed delegates" of their respective departments. Shull requested the respondent's plant superintendent, its general manager and its office manager to hold themselves in readiness for a conference with the Employees Committee. At the close of the meeting, which lasted five hours, the Employees Committee requested the respondent's officers to come to the assembly room for a conference. Shull handed the "Yes and No" petition to respondent's general manager and stated that they were ready to bargain. The respondent's manager, in the presence of all the employees attending the meeting, informed the Employees Committee that it would be necessary to refer the requested wage increase to the respondent's board of directors but stated that the respondent would recognize the Employees Committee as the exclusive bargaining agency of its employees. He suggested, however, that the "Yes and No" petition be recirculated and signed by the employees.

Accordingly, the employees circulated in each department of the plant separate copies of a petition, herein called the June 19 petition, which stated:

"We the undersigned will be satisfied to receive a raise in salary to the extent of $2.00 below Union scale, said salary to remain within the margin in proportion to the

Union scale for same number of hours; also for a period of one year and subject to renewal.

"Power for Committee to settle all grievances with the foreman of the various departments.

"Full seniority to prevail in all departments and on all shifts.

"We also authorize our delegate —— to sign the original agreement with the company."

The various copies of the petition were signed by an aggregate of ninety employees. On June 21 or 22 the respondent granted the requested wage increase making it effective as of June 18, 1937.

On July 6, August 3, and August 23, the respondent and the Council again conferred and discussed the same demands which the Council had made at the earlier conferences. The parties were unable to reach any agreement.

On August 24, 1937, the respondent's general manager addressed a letter to the members of the Employees Committee formally recognizing them as the "exclusive representative of all the employees in the mechanical department for the purposes of collective bargaining in respect to pay, wages, hours of employment and other conditions of employment." The letter further set forth a wage scale together with other terms and conditions of employment and concluded, "This agreement is for the term of one year beginning September 3, 1937." The letter was approved by the members of the Employees Committee and returned to respondent's manager.

In January 1938 the Council again attempted to negotiate with the respondent. The respondent's officers indicated that it was satisfied with the plan under which the plant was then operating and that no further negotiations with the Council were desired.

On the basis of the above findings of fact the Board reached the following conclusions:

"Prior to the June 10 election there was no thought among the respondent's employees of forming an 'Inside' union, nor did they see the necessity of forming a committee to represent them. On the contrary in February they had relied solely on a petition demanding a wage increase, which was not signed and which bore only the word 'yes' written by a number of the employees indicating their approval of it. The first suggestion of a 'company union' appeared on the ballot which was prepared by the respondent and used in an election conducted by the respondent without the cooperation of the Council. Immediately after the election the Employees Committee was organized and soon was recognized by the respondent as the collective bargaining representative of its employees. We find that the respondent's suggestion that the employees might vote for a 'company union' furnished the inspiration for the organization of the Employees Committee, two members of which were never selected by any employees and the remaining eight members being selected by acclamation of a small group within the various departments of the plant.

"As was evidenced by the Council's authorization cards as well as the results of the June 10 election, a substantial number of the respondent's employees desired the Council as their collective bargaining agent. It was after the strong expression of sympathy for the Council in the June 10 election that the proponents of an 'inside' organization were able to obtain substantial concessions from the respondent. The circulation with the aid of foremen and other supervisory employees, of the 'Yes and No' and June 19 petitions, both of which were typed in the respondent's offices; the donation of the assembly room for the June 19 meeting; the recognition of the Employees Committee as the exclusive bargaining agency solely on the basis of the 'Yes and No' petition; and the granting of the wage increase to within $2.00 of the union wage scale, after the respondent had repeatedly told the Council that it could not afford to pay wages as high as the union rates, all testify to the respondent's desire to encourage the Employees Committee and to assist it in making an effective appeal to the employees.

"Considering the respondent's attitude in its negotiations with the Council, we are led to the conclusion that its prompt recognition of the Employees Committee and its granting of the Employees Committee's request for a wage increase were motivated by the respondent's desire to encourage an organization of its employees within the plant and to discourage any attempts of outside labor organizations effectively to appeal to its employees. It is clear that the only function of the Em-

ployees Committee has been to crystallize, with the aid of the respondent, the fruits of the Council's organization campaign and negotiations, and at the same time thwart the Council's attempts to obtain the respondent's recognition of it as the employees' collective bargaining representative.

"We find that the respondent, by its activities described above, has dominated and interfered with the formation and administration of the Employees Committee, and has contributed support thereto, and has thereby interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act [29 U.S.C.A. § 157]."

The respondent contends that there is no basis for the conclusion that the suggestion by respondent that its employees vote regarding their preference for a company union in the Price, Waterhouse & Co. election furnished the inspiration for the organization of the Employees Committee. The respondent argues that the committee headed by Shull was simply a repetition of the committee which circulated the February petition. Unquestionably, the demands contained in the two petitions are practically identical and both petitions were started in the pressroom. It is significant, however, that at the time of the February petition no attempt was made to create any form of organization among the employees for the purpose of collective bargaining and that until just prior to the Price, Waterhouse & Co. election the sole issue before the employees was whether they should authorize the Council to represent them as their bargaining agent or whether they should remain unorganized. As stated by the respondent, this issue was causing considerable unrest and agitation in the plant. In the midst of this controversy the respondent injected a new issue by its proposal that a third alternative, a company union, be considered by its employees. The inevitable result was a split in the votes of those employees desiring some form of organization. The evidence is clear that respondent did not wish the Council to represent the employees. The only conceivable purpose for requiring a consideration of the company union, a form of organization theretofore non-existent in the plant, must have been to influence the vote and to suggest a new alternative as a basis of subsequent discussion. That the suggestion was regarded by the em-

ployees as not without significance seems apparent. Within a few days following the election a loose form of employee organization began to assume shape within the plant. It received the tactful guidance and advice of the respondent's officers during some of the steps in its formation. It was recognized as the exclusive bargaining agency of the employees with all possible speed. Its demands were granted at once. The conclusion that it was inspired by the respondent is the reasonable inference under these circumstances. In any event the choice of that inference as opposed to the contrary inference that the Committee was simply an outgrowth of the February petition without being in any way a response to the respondent's suggestion of a company union is for the Board and not for this court. Labor Board v. Falk Corp., 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396; Labor Board v. Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; Labor Board v. Waterman S. S. Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704.

The respondent urges that the Board should have attached no significance to the conduct of the respondent's supervisory employees in the promotion of the Employees Committee. The argument is that these employees were included among the respondent's production employees who were found to be an appropriate bargaining unit by the Board and that therefore they were entitled actively to participate in the promotion of the Employees Committee. Whether the foremen were in fact included within the appropriate bargaining unit does not appear in the Board's findings. In any event the argument is unsound. The respondent must be held responsible for the acts of its supervisory employees even though those employees may be included in an appropriate unit for collective bargaining. If it were otherwise an employer could freely influence his employees' freedom of choice by this means yet claim immunity. As between respondent and its foremen the doctrine of respondeat superior applies and the responsibilities of that relationship are not suspended merely because the foremen chance to be included within the appropriate unit for collective bargaining. See Swift & Co. v. National Labor Relations Board, 10 Cir., 106 F.2d 87, 93; National Labor Relations Board v. American Mfg. Co., 2 Cir., 106 F.2d 61, 67; Virginia Ferry Corp. v.

National Labor Relations Board, 4 Cir., 101 F.2d 103, 106.

The respondent complains that the Board has seized upon trivialities in finding that respondent lent support to the Employees Committee. Reference is made to the fact that the Board found that the respondent permitted the use of a typewriter belonging to it to be used in the preparation of the petition and that respondent granted the Committee the use of its assembly room for the meeting of June 19, 1937. Little need be said on this point. These acts of respondent were but part of the general background upon which the Board reached its conclusion that the respondent desired to encourage the Employees Committee. As isolated instances of support they are not particularly important but when considered with all other circumstances they form an entirely adequate basis for the Board's conclusion.

■ Finally, the respondent argues that the Board was not entitled to emphasize the importance of the wage increase granted by respondent at the request of the Employees Committee. The respondent calls attention to the fact that it would have increased its annual payroll $11,500 more than the increase actually granted had it acceded to the demands of the Council. The implication of that statement is that by granting the requested increase the respondent was enabled to forestall the Council's demands. However this may be, such is the fact. Prior to the Council's activity in the plant a similar request for a wage increase was denied. During the period that the Council became active the respondent granted the requested wage increase upon the request of the Employees Committee with all possible alacrity. The bargaining power of the Employees Committee was unquestionably derived from the activity of the Council in the plant. Had the increase not been granted the Employees Committee, in all probability, would have faded into that obscurity that characterizes the proponents of the February petition. By granting the increase at once the Committee was given life as a bargaining agency and the respondent was thereafter in a position to refuse further negotiations with the Council. The wage increase, therefore, was certainly a relevant circumstance for the Board to consider in determining the question of respondent's domination and support of the Employees Committee. Labor Board v. Falk Corpora-

tion, 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396; National Labor Relations Board v. Stackpole Carbon Co., 3 Cir., 105 F.2d 167, 172.

■ 2. The respondent's contention that the Board has no power to order the disestablishment of the Employees Committee and the voidance of its contract with the respondent because of the fact that the Committee was not made a party in the hearing before the Board has been determined adversely to respondent in National Licorice Company v. National Labor Relations Board, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799, decided March 4, 1940; Bussmann Manufacturing Company v. National Labor Relations Board, 8 Cir., 111 F.2d 783, decided May 14, 1940.

A decree will be entered enforcing the order.