BETHLEHEM SHIPBUILDING CORPORATION LIMITED, et al. v. NATIONAL LABOR RELATIONS BOARD.

GENERAL BODY OF EMPLOYEES' REPRESENTATIVES, etc. v. SAME.

Nos. 3437, 3467.

Circuit Court of Appeals, First Circuit.

Oct. 8, 1940.

Claude R. Branch, of Boston, Mass. (John L. Hall and Choate, Hall & Stewart, all of Boston, Mass., and Hoyt A. Moore, Bruce Bromley, Albert R. Connelly, and Cravath, de Gersdorff, Swaine & Wood, all of New York City, on the brief), for Bethlehem Shipbuilding Corporation, Ltd., and others.

Robert A. Zottoli, of Quincy, Mass., for General Body, etc.

H. Gardner Ingraham, Atty., N.L.R.B., of Washington, D. C., Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Samuel Edes and Louis Libbin, Attys., National Labor Relations Board, all of Washington, D. C., for the Board.

Before MAGRUDER and MAHONEY, Circuit Judges, and McLELLAN, District Judge.

MAGRUDER, Circuit Judge.

Bethlehem Shipbuilding Corporation, Ltd., formerly a Delaware corporation, and Bethlehem Steel Company, a Pennsylvania corporation, petition under Section 10(f) of the National Labor Relations Act, 49 Stat. 455, 29 U.S.C.A. § 160(f), for review of an order of the National Labor Relations Board dated February 10, 1939.[1] These two petitioners will hereinafter be referred to collectively as Bethlehem. Consolidated

---

[1] The order of the Board is as follows:

"Upon the basis of the above findings of fact and conclusions of law, and pursuant to Section 10 (c) of the National Labor Relations Act, the National Labor Relations Board hereby orders that the respondent, Bethlehem Shipbuilding Corporation, Limited, and its officers, agents, successors and assigns shall:

"1. Cease and desist from:

"(a) Dominating or interfering with the administration of the Plan of Employees' Representation at the Fore River Plant of Bethlehem Shipbuilding Corporation, Limited, or the Plan of Employees' Representation at the Boston Plant of Bethlehem Shipbuilding Corporation, Limited, or the formation and administration of any other labor organization of its employees, and contributing financial or other support to the Plan of Employees' Representation at the Fore River Plant of Bethlehem Shipbuilding Corporation, Limited, or to the Plan of Employees' Representation at the Boston Plant of Bethlehem Shipbuilding Corporation, Limited, or to any other labor organization of its employees;

"(b) Recognizing the Plan of Employees' Representation at the Fore River Plant of Bethlehem Shipbuilding Corporation, Limited, or the Plan of Employees' Representation at the Boston Plant of Bethlehem Shipbuilding Corporation, Limited, as the representative of any of the employees for the purposes of dealing with the respondent concerning grievances, labor disputes, wages, rates of

with this case is a petition by the General Body of Employees' Representatives under the Plan of Employees' Representation at the Fore River Yard of Bethlehem Steel Corporation, Shipbuilding Division, asking a review of the same order, partly on the ground that the Board was in error in sustaining the trial examiner in his denial of a motion of this petitioner, hereinafter referred to as the General Body, asking leave to intervene in the complaint case relating to Bethlehem's Fore River plant. At the time of the hearing before the Board the Bethlehem Shipbuilding Corporation and the Bethlehem, Steel Company were wholly-owned subsidiaries of the Bethlehem Steel Corporation, a Delaware corporation. Thereafter, but before the Board issued its order, the Shipbuilding Corporation was merged into the Bethlehem Steel Company, which has continued to carry on the business formerly conducted by the Shipbuilding Corporation. The order of the Board is directed against "Bethlehem Shipbuilding Corporation, Limited, and its officers, agents, successors and assigns". In its answer to the petitions for review the Board asks that its order be enforced by decree of this court.

The unfair labor practices complained of are alleged to have occurred at Bethlehem's Fore River plant at Quincy, Massachusetts, and at its Boston plant, consisting of the Simpson Works and the Atlantic Works which are operated as a unit.

At its Fore River plant, Bethlehem is chiefly engaged in designing and building instrumentalities of commerce, vessels of various kinds, ranging from "small steam fishing trawlers to the largest American vessels afloat", but principally destroyers and cruisers for the United States Navy. In 1936, and again in 1937, the value of ships constructed there was in excess of $23,000,000. Between 1930 and 1937 there were constructed for the United States Navy four cruisers, seven destroyers, and

pay, hours of employment and other conditions of work;

"(c) Refusing to bargain collectively with the Industrial Union of Marine and Shipbuilding Workers of America, Local No. 25, as the exclusive representative of the production, maintenance and stockroom employees of the respondent at its Boston plant, excluding office, clerical and supervisory and executive employees, draftsmen, watchmen and janitors;

"(d) In any other manner interfering with, restraining or coercing its employees in the exercise of their rights to self-organization to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection as guaranteed in Section 7 of the National Labor Relations Act.

"2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

"(a) Withdraw all recognition from the Plan of Employees' Representation at the Fore River Plant of Bethlehem Shipbuilding Corporation, Limited, and from the Plan of Employees' Representation at the Boston Plant of Bethlehem Shipbuilding Corporation, Limited, as the representative of any of its employees for the purpose of dealing with the respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment or conditions of work and completely disestablish said Plans as such representatives;

"(b) Upon request bargain collectively with the Industrial Union of Marine and Shipbuilding Workers of America, Local No. 25, as the exclusive representative of all the production, maintenance and stockroom employees of the respondent at its Boston plant, Boston, Massachusetts, exclusive of office, clerical, supervisory and executive employees, draftsmen, watchmen and janitors, in respect to rates of pay, wages, hours of employment and other conditions of employment, and if an understanding is reached on any of such matters, embody such understanding in a signed agreement;

"(c) Post immediately in conspicuous places in each department of the respondent's Fore River and Boston plants notices stating: (1) that the respondent will cease and desist as aforesaid; (2) that the respondent withdraws and will refrain from all recognition of the Plan of Employees' Representation at the Fore River Plant of Bethlehem Shipbuilding Corporation, Limited, and the Plan of Employees' Representation at the Boston Plant of the Bethlehem Shipbuilding Corporation, Limited, as the representative of any of its employees; (3) that the respondent completely disestablishes said Plans as such representatives;

"(d) Maintain such notices for a period of at least sixty (60) consecutive days from the date of posting;

"(e) Notify the regional director for the first region in writing within ten (10) days from the date of this order what steps the respondent has taken to comply herewith."

one seagoing hopper dredge. Between 1930 and 1938, seven freight and passenger vessels, one ferry boat, four oil barges, and two oil tankers, also numerous fishing trawlers, were constructed for other customers. At the time of the hearing Bethlehem was building at the Fore River plant three cargo and passenger vessels for the Panama Canal, and two destroyers and one aircraft carrier for the United States Government. Bethlehem also manufactures and sells, on specific order, certain articles of marine equipment, such as turbines, boilers and miscellaneous machine parts. Raw materials in excess of $6,500,000 flow into the Fore River plant annually, over fifty per cent thereof being derived from points outside Massachusetts. Bethlehem operates the Fore River Railroad which connects with the New York, New Haven & Hartford Railroad, over which is hauled most of the raw materials purchased by the respondent for the Fore River plant.

At its Boston plant Bethlehem is engaged in repairing, reconditioning and reconverting ships of all kinds. During 1937 approximately 505 vessels were repaired. Of these, 31 were public vessels, 91 were fishing vessels, and 244 were cargo and passenger vessels, the greater number of which were engaged in coastwise, intercoastal and foreign commerce. Raw materials purchased in 1936 and 1937 exceeded one-half million dollars annually, a substantial portion of which came from outside Massachusetts.

In respect to its business at both the Fore River and the Boston plants, Bethlehem is clearly subject to the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014; Virginian Ry. Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; Newport News Shipbuilding & Dry Dock Co. v. National Labor Relations Board, 4 Cir., 101 F.2d 841, on certiorari, 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219; National Labor Relations Board v. Norfolk Shipbuilding & Drydock Corp., 4 Cir., 109 F.2d 128. All that was necessarily decided by this court in Myers v. Bethlehem Shipbuilding Corp., 1

Cir., 89 F.2d 1000, was that considering the doubt as to the Board's jurisdiction, on the record then before the court, the district court was not in error in temporarily restraining the holding of a Board hearing, pending final hearing on Bethlehem's application for an injunction. Since then, however, we have had the benefit of subsequent decisions emphasizing the broad extent of the Board's jurisdiction as conferred by Congress under the commerce power. Now the question of jurisdiction is presented to us, not on affidavits of Bethlehem in support of an application for an injunction, but after an administrative hearing in which there was a full development of the facts as to Bethlehem's business and its interstate implications, and a finding by the Board as follows:

"We find that the respondent is not only engaged in commerce to a substantial degree but is also engaged in the construction, repairing, and overhauling of instrumentalities of commerce. A stoppage of the respondent's operations would burden commerce by depriving commerce of its instrumentalities and by depriving its instrumentalities of the repairs necessary to their continued operation. We further find that the activities of the respondent set forth hereinafter, occurring in connection with the operations of the respondent described in this section, have a close, intimate and substantial relation to trade, traffic, transportation and commerce among the several States and between the several States and foreign countries, and tend to lead to labor disputes burdening and obstructing commerce and the free flow of commerce."

We cannot say that "such finding was without adequate evidence to support it." Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 49, 50, 58 S.Ct. 459, 463, 82 L.Ed. 638. See also National Labor Relations Board v. Fainblatt, 306 U.S. 601, 608, 59 S.Ct. 668, 83 L.Ed. 1014.

The Board's original complaint in this case was issued April 13, 1936. It alleged that Bethlehem was dominating and interfering with the Employees' Representation Plan at the Fore River plant, and contributing financial and other support to it in violation of Section 8(2) and Section 8(1) of the National Labor Relations Act.[2] Bethle-

---

[2] "Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

hem thereupon obtained from the United States District Court an injunction against the scheduled Board hearing, which injunction this court declined to vacate, Myers v. Bethlehem Shipbuilding Corp., 1 Cir., 88 F.2d 154; Id., 1 Cir., 89 F.2d 1000, but which the Supreme Court ultimately directed to be vacated as having been improvidently issued. Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638. The delay occasioned by this injunction would not, of course, impair the power of the Board to give such relief as was appropriate on the facts as they existed when the complaint was issued.

On February 18, 1938, the Board issued a separate complaint against Bethlehem in respect to its Boston plant, alleging (1) that Bethlehem was dominating and interfering with the formation and administration of the Plan of Employees' Representation at the Boston plant, and contributing financial and other support to it, in violation of Section 8(2) and Section 8(1) of the Act, and further alleging (2) that Bethlehem had refused to bargain collectively with the Industrial Union of Marine & Shipbuilding Workers of America, the designated representative of a majority of the employees in an appropriate unit at the Boston plant, in violation of Section 8(5) and Section 8(1) of the Act.

■ These two complaint cases were consolidated by the Board for hearing before a trial examiner, along with petitions filed under Section 9 of the Act, 29 U.S.C.A. § 159, by Local 5 and by Local 25 of the Industrial Union of Marine & Shipbuilding Workers of America, asking for investigation and certification of collective bargaining representatives at the Fore River and Boston plants, respectively. The two complaint cases were argued orally before the Board upon exceptions to the intermediate report of the trial examiner. The Board disposed of the four cases in a single "decision, order and direction for election." In addition to asking us to re-view the Board's order in the complaint cases, the petitions now before us also ask this court to review and set aside the Board's direction for an election at the Fore River plant. We have no jurisdiction to review such direction for an election. National Labor Relations Board v. International․ Brotherhood of Electrical Workers, 308 U.S. 413, 60 S.Ct. 306, 84 L.Ed. 354; American Federation of Labor v. National Labor Relations Board, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347; National Labor Relations Board v. Falk Corp. 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396.

■ No legal error was committed by the Board in its affirmance of the ruling of the trial examiner denying the motion of the General Body to be allowed to intervene in the Fore River complaint case. National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799; National Labor Relations Board v. Christian Board of Publication, 8 Cir., 113 F.2d 678, 683. Furthermore, it may be noted that in a protracted hearing before the trial examiner, Bethlehem stoutly resisted the charge of domination; the records and operations of the Employees' Representation Plan since its inception in 1923 were exhaustively examined and spread in the record, and leading representatives from the General Body testified at length. It is not likely that any further light could have been shed on the matters at issue, even had the General Body been admitted as a formal party, which status it could not demand as a matter of law.

■ Petitioners challenged many of the Board's findings as without support in the evidence. "We do not stop to consider these contentions, since, without such findings, there would still be a basis in the record for the Board's conclusions." National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 247, 60 S.Ct. 203, 207, 84 L.Ed. 219.

"Sec. 8. It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [157 of this title].

"(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: Provided, That subject to rules and regulations made and published by the Board pursuant to section 6 (a) [156 of this title], an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay. * * *

"(5) To refuse to bargain collectively with the representatives of his employees, subject to the provisions of Section 9 (a) [159(a) of this title]." 29 U.S.C.A. §§ 157, 158(1, 2, 5).

## Alleged Unfair Labor Practices at Fore River Plant.

The so-called "Bethlehem Plan of Employee Representation" was inaugurated at the Fore River plant in 1923. Summarizing from the Board's findings, supported by adequate evidence, as to the circumstances of its installation at this particular plant, the following facts appear: Late in February of 1923 the employment manager summoned 25 employees into the board room. High officials of the company explained to them the representation plan, which was said to be in successful operation in other Bethlehem plants. The group of employees were requested to explain the Plan to the employees in their respective departments; there is evidence that this was done to some extent, though no general meeting of all the employees was held. On the following day notices explaining the Plan and stating that it would be put in effect were posted on the bulletin boards. The notices listed the names of the 25 selected employees and suggested that persons interested consult with them. Approximately ten days later the same 25 employees were again called to the board room, where they were told by the employment manager that the Plan was ready to be put into effect. They were asked to act as tellers at the balloting to nominate candidates for employee representative and to "talk it up among the employees." Twenty-one employee representatives were elected from the various departments and proceeded to organize into committees as provided in the Plan. The employees assumed no initiative or responsibility in the formation of the Plan, which was furnished and installed in its entirety by the management.

The original Plan was set forth in a printed booklet entitled "Representation of Employees in Plants of the Bethlehem Shipbuilding Corporation, Ltd." It contained twelve articles embracing representation, terms of employees' representatives, qualification of representatives and voters, nominations and elections, management's representatives, committee meetings, annual conference, procedure for adjustments, guaranteed independence of employees' representatives, and amendments. Employee representatives were chosen by departments, in proportion to the number of employees therein, by secret ballot, following nominations, to serve for a term of one year. Only employees who had been on the company's payroll for six months were eligible for election as representatives. The whole group of employee representatives so chosen constituted the General Committee or General Body, the function of which was to receive, discuss and generally report all matters of interest to employees and to refer matters to the proper committees for adjustment. The General Body divided itself into various standing committees. Provision was made for stated meetings of these various employee committees.

The Plan also set up corresponding committees of employer representatives, and the respective employer and employee representatives together functioned as joint committees, on which management and men had equal voting strength. In addition, the company appointed a "management's special representative" who was charged with the duty of keeping in touch with the employee representatives and representing management in negotiations with the officers and committees of the employee representatives.

A procedure for adjustment of grievances provided successive stages of review from department foreman through the committees of the Plan to the president of the corporation.

For time necessarily occupied in actual attendance at regular meetings or at special meetings or conferences "jointly approved", representatives were to receive from the company payment commensurate with their average earnings. In addition, Bethlehem undertook to defray such expenses as are necessarily incident to the discharge of Plan duties when approved by a majority of the joint committee on rules.

Under the original Plan, Bethlehem retained effective control or veto over amendments by the provision that "any method of procedure hereunder may be amended at any time by a two-thirds vote of the entire membership of the Joint Committee on Rules, or by concurrent majority vote of the Employees' Representatives and of the Representatives of the Management at an Annual Conference."

Membership in the Plan is automatic. All non-supervisory employees who have been on the payroll for sixty days prior to nominations are eligible to vote. There are no applications for membership, no initiation fees, no dues and no membership cards.

No independent method of financing the Plan was provided, but from the beginning and continuing up till April, 1937, when the constitutionality of the National Labor Relations Act was upheld, the company defrayed all the expenses of the Plan and compensated employee representatives for time spent on Plan duties. This necessarily constituted a potential restraint upon the freedom of action of the employee representatives. In 1931 the General Body complained of the meagerness of the budget allowance for Plan expenses as announced by the management's special representative stating that it would be impossible to do even the routine representative work within the time limits allowed. Upon another occasion, in 1927 or 1928, the General Body voted a resolution proposing an annual conference of employee representatives of the Fore River plant with employee representatives of other Bethlehem plants, to be held at Bethlehem, Pa., to consider their common problems. Management approval was not attained, and the plan accordingly fell through.

Notwithstanding this financial dependence upon the company, various employee representatives testified that they were under no sense of constraint, and felt free in their negotiations with the management to pursue vigorously the interests of the employees. This is a subtle thing, and the recognition of constraint may call for a high degree of introspective perception. The employee representatives throughout the history of the Plan have through the various committees and through the Plan procedure taken up with management a wide variety of questions concerning wages, working conditions, overtime, individual grievances, etc., and we may assume that in many cases satisfactory adjustments were reached by enlightened action on both sides.

■ Incident to Bethlehem's undertaking to bear the expenses of the Plan, minutes of the meetings of the various committees were mimeographed by the management and copies retained in its files. This practice, which was continued until 1937, afforded management a certain oversight of the proceedings of the employee committees. In 1930 a resolution was voted by the General Body proposing to give public endorsement to a bill pending in the Massachusetts legislature increasing weekly and death benefits under the Workmen's Compensation Act. Management's special representative thereupon promptly wrote to the General Body that the Representative Plan "is an instrument for the settlement of any differences which may arise between the employees and the management and it is in no way concerned with any matters outside of the plant, therefore, this being the purpose of the Plan the management disapproves of any action of this committee with matters outside of the plant." But the right of employees to self-organization, and to engage in concerted activities, now guaranteed by Section 7 of the National Labor Relations Act, is not limited to direct collective bargaining with the employer, but extends to other activities for "mutual aid or protection", including appearance of employee representatives before legislative committees.

In contrast to the incident just recited, the management in 1934 called a special meeting of the General Body to inform the representatives of a protest meeting to be held in Washington against the passage of the pending Wagner Act. A committee of employee representatives went to Washington to testify in opposition to the bill. The chairman of the General Body read a statement asserting that "the provisions of the bill are in absolute opposition to the Plan under which we have operated for the past eleven years * * *."

Bethlehem has woven into the administration of the Plan a relief plan, a community chest fund, a pension plan, a clothing store and a gasoline station operated by the company.

The relief plan was formed by the company in 1926 and is administered through one of the joint committees of the Representation Plan. Among its charitable functions, it distributes Christmas and Thanksgiving baskets to needy employees.

The community chest fund was established in 1928. It is administered jointly by management and employees through a board of trustees consisting of three employee representatives and two management representatives. It has been financed by drives and dances conducted by the employee representatives, by occasional management contributions and by the profits from the clothing store and gasoline station. Minutes of meetings of the Plan show various memoranda from the general manager, assistant general manager, and general superintendent addressed to fore-

men, requesting them to get behind the various community chest drives, and in one instance informing them that "your allotment of tickets has been distributed to your department and you will please see that they are distributed to both supervisors and employees alike." The trustees are empowered to expend the fund for the relief of needy employees and their families, and "for such other purposes as the Trustees may deem advisable for the benefit of the employees of the Fore River plant". In addition to expenditures for charitable purposes this fund was drawn upon to pay the expenses of the employees committee in their trip to Washington to oppose the Wagner Act and to reprint articles antagonistic to the Industrial Union's efforts to organize the employees.

The pension plan created by Bethlehem in 1931 provided for a disability pension and a voluntary pension after twenty-five years of continuous service. Questions of eligibility for pensions are considered by one of the joint committees of the Representation Plan.

In a statement by President Grace distributed among the employees in 1933 it was emphasized that "the Plan has become vital in the administration of our business". Also, "all of these benefits of collective bargaining are afforded under our Employees' Representation Plan without cost to the employee". In another statement distributed in 1937 President Grace stated that "those who would serve best the interests of labor will protect the Plan. They will protect it for what it is, a fair, square, effective and responsible method of collective bargaining."

 From the foregoing it appears that prior to July 5, 1935, when the National Labor Relations Act went into effect, Bethlehem had impressed upon the Fore River plant a particular pattern of employee representation and had maintained it in existence by continuing support. It cannot be said as a matter of law that participation by a large majority of the employees in the annual Plan elections for representatives made this their freely chosen method of representation. As this court said in National Labor Relations Board v. H. E. Fletcher Co., 1 Cir., 108 F.2d 459, 465: "True, they have participated in the periodic election of representatives under the Plan. This, however, does not signify that they approve the Plan. Their only choice is to vote or not to vote, under the Plan. If they do not vote, representatives will be chosen by those who do, and these representatives will be recognized by the company as the sole bargaining agents for the employees."

Even had Bethlehem afforded the employees an opportunity for a secret referendum on the question whether the Plan should be continued in force, this would not necessarily have given the Plan a clean bill of health. National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 251, 60 S.Ct. 203, 84 L.Ed. 219.

 What Bethlehem did before July 5, 1935, is, of course, no violation of the Act. But since that date there has been no break in the continuity of the Plan, and the Board might conclude, not unreasonably, that the effect of Bethlehem's prior conduct in canalizing the employees' desire for representation carried over after the Act was passed and constituted a continuing obstacle to the exercise by employees of their free choice of bargaining representatives. This effect was furthermore reinforced after July 5, 1935, by the continuing support, financial and otherwise, which Bethlehem gave to the Plan, necessarily in violation of Section 8(2) of the Act, up to the time the Act was declared constitutional.[3]

On or before May 15, 1936—the exact date not being disclosed in the record—certain amendments were made to the Plan. One of these, stressed by Bethlehem as indicating its purpose to abdicate any vestige of control, prescribed a change in the procedure for adopting amendments to the Plan. Originally, as previously stated, no amendment could be made without employer assent. The revised procedure, which was in the Plan at the time of the Board hearing and order, provided that the Plan

---

[3] Shortly after that, on June 14, 1937, later amendments were adopted restricting Bethlehem's undertaking to compensate employee representatives for time spent on Plan duties and to defray the expenses of the Plan to the "extent permitted by law". Bethlehem thereupon discontinued its practice of compensating employee representatives for time spent on Plan duties and of defraying Plan expenses, and funds for the operation of the Plan were raised by dances, socials, etc., conducted by the employees.

might be amended at any regular meeting of the General Body by two-thirds vote of the entire membership thereof, "except that any amendment which would necessarily change the procedure provided by the Plan for the adjustment of grievances or which might prevent the Plan from operating as a fair method of selecting representatives of the whole body of employees of the Corporation and as a fair method of collective bargaining or which might materially increase the obligations imposed upon the Corporation under the Plan, shall not become effective, until it shall also have been approved by the Joint Committee on Rules, Ways and Means." The Plan is silent as to the machinery for deciding whether a particular amendment proposed by the men is or is not one requiring the assent of the management. Much argument was addressed to us on this point. Perhaps Bethlehem is right in its contention that such a question would have to be resolved by the courts and that Bethlehem could not block any proposed amendment merely by asserting that it fell within the exception above quoted. Even so, considering the ambiguity of the language, this article of the Plan tends to put some restraint on the proper freedom of employees. A proposed change in the method of electing representatives, desired by the men, might have to be assented to by the management if a court, applying an objective standard of fairness, determined that the proposal "might prevent the Plan from operating as a fair method of electing representatives * * * and as a fair method of collective bargaining."

Bethlehem urges that though a cease and desist order might have been proper, the Board as a matter of law was in error in finding, as it did, that an affirmative order of disestablishment was necessary "to effectuate the policies of the Act and free the employees of the respondent from such domination and interference, and the effects thereof, which constitute a continuing obstacle to the exercise by the employees of the rights guaranteed them by the Act." We cannot agree. Within broad limits, it is for the Board, not for the courts, to draw the inference from the underlying facts as to what means of affirmative relief are necessary to undo the effects of an unfair labor practice and to effectuate the policies of the Act. National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261,

265, 270, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Falk Corp., 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396; cf. National Labor Relations Board v. Fansteel Corp., 306 U.S. 240, 257, 258, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599.

Mr. Justice Roberts, speaking for the Court in National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 250, 251, 60 S.Ct. 203, 208, 84 L.Ed. 219, said:

"The Board held that, where an organization has existed for ten years and has functioned in the way that the Committee has functioned, with a joint control vested in management and men, the effects of the long practice cannot be eliminated and the employes rendered entirely free to act upon their own initiative without the complete disestablishment of the plan. On the record as made we cannot say this was error. * * *

"As pointed out in National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, disestablishment of a bargaining unit previously dominated by the employer may be the only effective way of wiping the slate clean and affording the employes an opportunity to start afresh in organizing for the adjustment of their relations with the employer. Compare National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 262, 59 S.Ct. 490, 498, 83 L.Ed. 627, 123 A.L.R. 599.

"The court below agreed with the respondent that, as the Committee had operated to the apparent satisfaction of the employees; as serious labor disputes had not occurred during its existence; and as the men at an election held under the auspices of the Committee had signified their desire for its continuance, it would be a proper medium and one which the employer might continue to recognize for the adjustment of labor disputes. The difficulty with the position is that the provisions of the statute preclude such a disposition of the case. The law provides that an employee organization shall be free from interference or dominance by the employer. We cannot say that, upon the uncontradicted facts, the board erred in its conclusion that the purpose of the law could not be attained without complete disestablishment of the existing organization which had been dominated and controlled to a

greater or less extent by the respondent. In applying the statutory test of independence it is immaterial that the plan had in fact not engendered, or indeed had obviated, serious labor disputes in the past, or, that any company interference in the administration of the plan had been incidental rather than fundamental and with good motives. It was for Congress to determine whether, as a matter of policy, such a plan should be permitted to continue in force. We think the statute plainly evinces a contrary purpose, and that the board's conclusions are in accord with that purpose."

In National Labor Relations Board v. Brown Paper Mill Co., 5 Cir., 108 F.2d 867, 871, the court said: "Therefore, when once it appears that management has had a hand in organizing, supporting or in any wise interfering or collaborating with an 'association' of employees, such an association may not be recognized as the free and voluntary association of employees called for in the act. If in such cases the employees really intend and want it to be such, their only sure course is to disestablish it as the bargaining agency and, entirely dissolving it, begin organization anew, upon their own time and their own devices without aid or comfort from the management."

In Westinghouse Electric & Mfg. Co. v. National Labor Relations Board, 2 Cir., 112 F.2d 657, 660, a disestablishment order was sustained in a much weaker case than the present. In that case there had been more of a break between the old representation plan and the new unaffiliated "independent" union which arose from its ashes after the plan went to pieces following the Supreme Court's decision in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. Judge Learned Hand, commenting on the disestablishment order in the Newport News case, supra, said: "The reason for this was that, although the new union would be lawful, if freely formed, it had in fact arisen out of the earlier organization, and the company had done nothing to mark the separation between the two, and publicly to deprive the successor of the advantage of its apparently continued favor. It is true that in that case there was somewhat less separation between the old and the new than in the case at bar; the union was in form merely a 'revision' of the earlier 'Plan', and its constitution had been prepared in part at any rate, by executives of the company. But that was not the circum-

stance which counted, as we understand it; it was rather that the employees at large had not been advised that the company was wholly indifferent whether they joined the new union, and that, as it might, and probably did, appear to be a successor of the old, the separation should have been made plain, and with it the discontinuance of any continued countenance from the employer. The theory is that in cases such as this, where an unaffiliated union seems to the employees at large to have evolved out of an earlier joint organization of employer and employees, the Board may take it as datum, in the absence of satisfactory evidence to the contrary, that the employees will suppose that the company approves the new, as it did the old, and that their choice is for that reason not as free as the statute demands. How substantial such a fear really is, it is not for us to say; upon how much evidence the Board may insist to make public the change, the court did not declare; nor need we here; for the company did not make any effort to make it plain to the employees generally that the 'Independent' was not a revision, or amendment, of the 'Plan'. On the surface it seemed to be such, for it emanated from the old elected representatives, and that alone established an appearance of continuity between the two. Madden's speech on May 12th was only to those representatives; the company did not seek to broadcast it or its equivalent in any way to the employees—about 2500 in all. So far as appears, it was content to let them assume, what was true, that the 'Independent' had arisen out of the 'Plan'; and to believe, as they quite naturally might have done, that it preferred the successor to the C.I.O. local just forming, and still very feeble. It is of course possible that it would have made no difference if the company had declared itself to all as Madden did at the meeting; but the Board was to decide how important that would have been; certainly it is not a question for us."

So far as we know, the courts upon sustaining a Board finding that an employer has been guilty of the unfair labor practice forbidden by Section 8(2) of the Act, have uniformly enforced disestablishment orders. See further, National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Pacific Greyhound Lines, Inc., 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838; National Labor Relations

Board v. Falk Corp., 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396; National Labor Relations Board v. Fansteel Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; National Labor Relations Board v. H. E. Fletcher Co., 1 Cir., 108 F.2d 459; National Labor Relations Board v. Christian Board of Publication, 8 Cir., 113 F.2d 678.

It is true, the Supreme Court stated in National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 270, 58 S.Ct. 571, 576, 82 L.Ed. 831, 115 A.L.R. 307, that: "We may assume that there are situations in which the Board would not be warranted in concluding that there was any occasion for withdrawal of employer recognition of an existing union before an election by employees under Section 9(c), 29 U.S.C.A. § 159(c), even though it had ordered the employer to cease unfair labor practices."

Such might be the case where an employer committed a merely technical violation of Section 8(2) by an isolated act of interference with the administration of a labor organization which had theretofore been freely chosen by the employees acting on their own, and not the employer's, initiative. No such exceptional case is now before us. On the facts of the case at bar we think the propriety of a disestablishment order has been settled by controlling authority.

### Alleged Unfair Labor Practices at Boston Plant.

 The "Bethlehem Plan of Employee Representation" was established at the Boston plant in 1933. The facts with reference to the genesis of this Plan, its structure and operation, are sufficiently similar to the situation at the Fore River plant so that no detailed statement of the evidence is necessary. No meetings of the employee representatives have been held since November 10, 1937, for lack of a quorum, the majority of the representatives under the Plan having joined the Industrial Union and boycotted the Plan. Nevertheless, the Plan has never been disavowed by Bethlehem; indeed, its special management representative testified that the Plan is still in effect. The Board's disestablishment order is appropriate.

 Between October 7, 1937, and January 4, 1938, Bethlehem conducted protracted negotiations with Local 25 of the Industrial Union of Marine & Shipbuilding Workers of America. Throughout, the company did not question the claim of Local 25 to have been designated by a majority of the employees. We sustain the Board's finding that the production, maintenance and stockroom employees at the Simpson and Atlantic Works of the Boston plant, exclusive of office, clerical, supervisory and executive employees, draftsmen, watchmen and janitors, constitute a single appropriate bargaining unit. Pittsburgh Plate Glass Co. v. National Labor Relations Board, 8 Cir., 113 F.2d 698. The evidence also warrants the Board's finding that on the crucial dates Local 25 had been chosen as bargaining agent by a majority of the employees in the appropriate unit. Bethlehem in its brief does not contend otherwise.

 After a lengthy review of the negotiations, the Board concluded that Bethlehem, "by refusing to bargain collectively with the Industrial Union of Marine & Shipbuilding Workers, Local No. 25, as the exclusive representative of its employees in the appropriate unit * * * has engaged in and is engaging in unfair labor practices within the meaning of Section 8(5) of the Act." Though the management several times met with officials of the Union, Bethlehem refused to bargain on the footing of recognizing Local 25 as the exclusive representative of all the employees—"a plain violation of the Act. §§ 8(5), 9(a)." National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 358, 60 S.Ct. 569, 574, 84 L.Ed. 799. Also, despite the fact that Bethlehem and Local 25 were in substantial agreement upon a considerable number of union demands, Bethlehem repeatedly refused the Union's request to embody any points of agreement in a written contract. Other circuit courts of appeals, in fully reasoned opinions, with which we agree, have held that this constitutes a refusal to bargain collectively within the meaning of the Act. Art Metals Construction Co. v. National Labor Relations Board, 2 Cir., 110 F.2d 148; National Labor Relations Board v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632; H. J. Heinz Co. v. National Labor Relations Board, 6 Cir., 110 F.2d 843. Cf. Fort Wayne Corrugated Paper Co. v. National Labor Relations Board, 7 Cir., 111 F.2d 869. Paragraph 2(b) of the order is proper. See the cases just cited.

 The cease and desist portions of the order, with reference to both plants (par. 1(a), (b), (c), (d)), are in a form

frequently approved by the courts as appropriate to the types of unfair labor practices here involved. National Labor Relations·Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Jeffery-De Witt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 112 A.L.R. 948; National Labor Relations Board v. H. E. Fletcher Co., 1 Cir., 108 F.2d 459; National Labor Relations Board v. National Motor Bearing Co., 9 Cir., 105 F.2d 652, 660, 661; Republic Steel Corp. v. National Labor Relations Board, 3 Cir., 107 F.2d 472; National Labor Relations Board v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632.

In its petition for review, Bethlehem alleges that it has been denied due process of law in that "upon information and belief, the Board did not itself consider all the evidence introduced in the hearing before the trial examiner, and did not itself make the purported findings of fact set forth in the decision", and further in that "upon information and belief, the intermediate report did not reflect the independent judgment of the trial examiner, but reflected the views of, and was prepared in part by, divers other persons unknown to the petitioners or either of them." The Board, in an answer, which the Act did not require it to file, states that "the Board neither admits nor denies" these allegations "for the reasons that said allegations are immaterial and irrelevant and relate to the mental processes of the Board, which mental processes are beyond the scope of judicial inquiry." This procedural point, discussed somewhat in Bethlehem's brief but not pressed at the oral argument, is not well taken. National Labor Relations Board v. Biles Coleman Lumber Co., 9 Cir., 98 F.2d 16; Cupples Co. Manufacturers v. National Labor Relations Board, 8 Cir., 103 F.2d 953; Inland Steel Co. v. National Labor Relations Board, 7 Cir., 105 F.2d 246; National Labor Relations Board v. Botany Worsted Mills, 3 Cir., 106 F.2d 263; National Labor Relations Board v. Lane Cotton Mills, 5 Cir., 108 F.2d 568.

Numerous rulings of the trial examiner and of the Board, to which objection has been made, have been considered and found to involve no prejudicial error.

A decree will be entered enforcing the order of the Board.